COHN LIFLAND PEARLMAN
  HERRMANN & KNOPF LLP
PETER S. PEARLMAN
JEFFREY W. HERRMANN
Park 80 Plaza West-One
Saddle Brook, NJ 07663
Telephone: 201/845-9600
201/845-9423 (fax)

Attorneys for Plaintiff

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

*"DOCUMENT ELECTRONICALL FILED"*

| | |
|---|---|
| GAIL P. NUTTALL and LESLIE LINDEMAN, Derivatively on Behalf of THE CHILDREN'S PLACE RETAIL STORES, INC., <br><br>         Plaintiff, <br><br> vs. <br><br> EZRA DABAH, et al., <br><br>         Defendants, <br><br> – and – <br><br> THE CHILDREN'S PLACE RETAIL STORES, INC., a Delaware corporation, <br><br>         Nominal Defendant. | No. 2:07-CV-00121 <br><br> SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS FOR BREACH OF FIDUCIARY DUTY, CONSTRUCTIVE FRAUD, CORPORATE WASTE, UNJUST ENRICHMENT, GROSS MISMANAGEMENT AND ACTION FOR ACCOUNTING <br><br> DEMAND FOR JURY TRIAL |

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought by shareholders of The Children's Place Retail Stores, Inc. ("Children's Place" or the "Company"), on behalf of the Company against its Board of Directors (the "Board") and certain of its senior executives (collectively, "Defendants").   This action seeks to remedy Defendants' violations of federal and state law, including breaches of fiduciary duty, constructive fraud, corporate waste, unjust enrichment and gross mismanagement, arising out of a scheme and wrongful course of business whereby Defendants allowed senior Children's Place insiders to divert millions of dollars of corporate assets to themselves via the manipulation of grant dates associated with hundreds of thousands of stock options granted to Children's Place insiders.   Each of the Defendants also participated in the concealment of the option grant manipulation scheme complained of herein and/or refused to take advantage of the Company's legal rights to require these senior insiders to disgorge the hundreds of millions in illicitly obtained incentive compensation and proceeds diverted to them since at least 1997.

2.      The practice of backdating stock options was first publicly disclosed on March 18, 2006, when *The Wall Street Journal* (the "*Journal*") published an article entitled "The Perfect Payday," in which it described stock option backdating practices by a number of companies at which executives had achieved extremely fortuitous stock option paydays, the likelihood of which defied random chance.

- 1 -

3.     The *Journal*, together with finance professors Eric Lie ("Professor Lie") of the Tippie College of Business at the University of Iowa, David Yermack of New York University Stern School of Business, and Professor John Emerson, a statistician at Yale University, studied patterns of particularly favorable stock grants at certain companies and calculated the probability of such patterns occurring randomly and concluded that the odds were improbable.

4.     This practice of backdating stock options, though widespread, remained undetected until such academic research revealed patterns of stock option grants that could not be explained by chance.  These studies noted the frequency with which stock option grants occurred just after a drop in stock price and immediately before the price rose, often at the lowest price of the month or year.  Such fortuitous timing could not be statistically explained by random selection of grant dates.

5.     One such academic study hypothesized that the dates of the grants had been selected retroactively, *i.e.*, with the benefit of hindsight.  Such retroactive dating, or "backdating" would permit the grantor to select the most advantageous price for the stock option and in effect create an "in the money" stock grant (one in which the actual stock price exceeds the option price on the day granted), that would appear as if it was granted while the stock price was low.  Since companies are required to report "in the money" grants as compensation to the recipient and as a charge to the corporation, the practice of backdating would provide a means to confer additional stock value, or compensation, to officers and employees that was not

detectable, thereby permitting the Company to conceal the additional compensation and forego reporting or recording the charge.

6.      When the grant date of a stock option is backdated, the grantee pays less for the stock and the corporation, the counterparty to the stock option grant, receives less when the stock option is exercised.  When stock options are backdated in this manner for the benefit of insiders (as they were in this case), the stated purpose behind a stock option plan – to strengthen the Company's ability to retain key employees and motivate such employees to remain focused on long-term stockholder value performance – is undermined to the detriment of the Company and its shareholders, because the stock options are already "in the money" when granted. Backdating stock option grants thus represents a direct and continuing waste of valuable corporate assets.

7.      Although the academic research did not identify specific companies that had engaged in these practices, it triggered increased scrutiny by the U.S. Securities and Exchange Commission (the "SEC"), as well as other government entities and officials.

8.      For example, on September 6, 2006, the U.S. Senate Committee on Finance (the "Finance Committee") held a hearing on "Executive Compensation: Backdating to the Future/Oversight of current issues regarding executive compensation including backdating of stock options; and tax treatment of executive compensation, retirement and benefits." At the hearing, former Finance Committee

- 3 -

Chairman, Senator Charles Grassley, in his opening statement, stated: "[options backdating] is behavior that, to put it bluntly, is disgusting and repulsive. It is behavior that ignores the concept of an 'honest day's work for an honest day's pay' and replaces it with a phrase that we hear all too often today, 'I'm going to get mine.' . . . [S]hareholders and rank-and-file employees were ripped off by senior executives who rigged stock option programs – through a process called 'back-dating' – to further enrich themselves. And as we have found far too often in corporate scandals of recent years, boards of directors were either asleep at the switch, or in some cases, willing accomplices themselves. . . ."

     9.     In fact, the seemingly fortuitous options-granting practices at Children's Place were the subject of Senate committee testimony the day before the Company announced its own purported internal investigation. In a September 6, 2006 hearing before the Senate Banking, Housing and Urban Affairs Committee, Lynn Turner, the SEC's former Chief Accountant, stated the following, and specifically identified Children's Place:

> Late Filings
>
> Now I would like to turn my attention to another issue of concern. That is the issue of late filings. In particular, late filings of the forms the SEC requires to be filed within two days by certain executives or corporate board members, namely Form 4's.
>
> ***A sample of actual Form 4s for the company, Children's Place Retail Stores, is included as Appendix B. These forms are required to be filed on a timely basis so investors have insights into transactions key insiders are entering into with respect to the stock of the company.*** In

fact, Enron and other corporate scandals highlighted just how late this information was being filed at times, much to the detriment of investors. And, in response to this concern, Congress adopted Section 403 of the Sarbanes-Oxley Act of 2002 to ensure investors received the information within two business days.

However, we continue to see late filings, or, quite frankly, Form 4's that are not filed at all.  For example, *if you look closely at one of the Children's Place Form 4 filings, you will see it was filed on May 20, 2005.  At the same time, the company states that the transaction date was on April 29, 2005, well outside the two-day requirement of SOX. Of interest in this instance is that Children's Place's stock price increased $9.58, or 26%, to $46.79 between the filing date of the Form 4 and the disclosed transaction date.  On May 5, 2005, the company issued a press release raising fiscal-year earnings guidance to $2.15-$2.25 a share from $2.10-$2.20 a share.  Children's Place does not have an established pattern of granting executive options at this time each year.  And while one might well be hesitant to draw conclusions as to why the Form 4 was filed late, the April 29 date did provide an unusually low exercise price for the options.*

10.    Mr. Turner also described backdating as follows: "It's like allowing people to place bets on a horse race after the horses have crossed the finish line." Arthur Levitt, former Chairman of the SEC, described backdating as stealing: "It is ripping off shareholders in an unconscionable way" and "represents the ultimate in greed."  There is no debate that stock options backdating represents unbridled corporate corruption and the worst sort of abuse of shareholders.

11.    Furthermore, the scrutiny on the practice of backdating stock options has entered into the criminal arena as well.  For instance, Gregory L. Reyes ("Reyes"), the Chief Executive Officer ("CEO") of Brocade Communications Systems ("Brocade"), was convicted in the U.S. District Court for the Northern

District of California on August 7, 2007 of ten (10) felonies, including conspiracy and securities fraud, for his role in a stock options backdating scheme, and was sentenced to twenty-one (21) months in prison.

12.   Shortly before the jury verdict, in an August 3, 2007 Order denying Reyes' motion for a judgment of acquittal, the Northern District of California described the charges against Reyes as follows: "the backdating practice is the basis for the charges that Reyes participated in a criminal conspiracy (Count One), engaged in a scheme to defraud investors (Count Two), made false filings with the Securities and Exchange Commission (Counts Five, Six, and Seven), kept false books and records (Count Eight), and made false statements to the company's accountants (Counts Nine, Ten, Eleven, and Twelve)." *U.S. v. Reyes*, No. C 06-00556 CRB at *2 (N.D.C.A. August 3, 2007).

13.   In finding that the prosecution's allegations concerning the backdating scheme satisfied the materiality requirement of the charges against Reyes, the Northern District of California noted the following:

> In other words, based on the evidence presented during the prosecution's case-in-chief, a reasonable jury could conclude, beyond a reasonable doubt, that there is a substantial likelihood that [the understatement of Brocade's compensation expenses] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available. (citations and internal quotations omitted). *Id.* at *6.

14.     Notably, the Reyes Court reached this conclusion even though Reyes was not alleged to have received any direct financial benefit from the backdated options at Brocade.

15.     This action arises from Defendants' repeated and egregious breaches of their fiduciary duties to the Company and its shareholders by approving and/or acquiescing in the issuance of Children's Place stock options to Company employees and directors that were unlawfully "backdated" or otherwise manipulated to provide the recipients with windfall compensation at the direct expense of the Company.

16.     To achieve the Company's stated goal of strengthening the Company's ability to retain key employees and motivating such employees to remain focused on long-term stockholder value performance, Children's Place's shareholder-approved stock option plans provide that *exercise prices were to be fixed on the date of the grant* and would be "*equal to the fair market value per share of Common Stock on such date.*" At Children's Place, however, Defendants blatantly violated this and other provisions of the Company's stock option plans by backdating or otherwise manipulating Children's Place stock options in order to illegally maximize the grantees' profits.  As such, and as detailed below, defendants' acts were *ultra vires* – unauthorized and beyond the scope of power granted to them.

17.     As alleged in detail herein, in gross breach of their fiduciary duties as officers and/or directors of Children's Place, Defendants colluded with one another to:

a)      improperly backdate or manipulate grants of Children's Place stock
options to several Company executives in violation of the Company's
shareholder-approved stock option plans;

b)      improperly record and account for the manipulated stock options, in
violation of Generally Accepted Accounting Principles ("GAAP");

c)      improperly take tax deductions based on the manipulated stock options,
in violation of Section 162(m) of the Internal Revenue Code, 26 U.S.C.
§ 162(m) ("Section 162(m)"); and

d)      produce and disseminate false financial statements and other SEC filings
to Children's Place shareholders and the market that improperly recorded and
accounted for the manipulated stock option grants and concealed the improper
backdating of stock options.

18.     On September 7, 2006, Defendants caused the Company to admit that it
was reviewing its historical options-granting practices and that it would delay filing
its Form 10-Q for the quarter ended July 29, 2006.

19.     On January 31, 2007, Defendants caused the Company to further admit
that it had engaged in improper options-granting practices, that previously issued
financial statements for fiscal years 2003, 2004, 2005 and the first quarter of 2006
would be restated, that the restatement was not expected to exceed $24 million, but
that this estimate was subject to the possibility of significant adjustment as a result of
further examination.

20.     On May 22, 2007, Defendants caused the Company to issue a further
press release indicating that the analysis of its financial results was still incomplete
and that the preliminary results announced for the first fiscal quarter of 2007 were

still subject to significant adjustment due to "the investigation into the Company's stock option practices."

21.    On December 5, 2007, Defendants caused the Company to finally announce that the restatement of its historical financial statements had been completed, and that stock option adjustments resulted in a decrease in net income of **$11.2 million**. Defendants further admitted that the Company did not maintain appropriate governance and other internal controls during the relevant period, which resulted in errors in the dating of options and other irregularities in option grants.

22.    Notably, Defendants also disclosed that, in addition to apparently selecting option grants dates with the benefit of hindsight, on multiple occasions, Children's Place insiders *"may have selected grant dates with a view toward upcoming disclosures.*"[1] In addition, Defendants announced that:

- *The Company and its directors (including Mr. Dabah, its former CEO), its President and its former Chief Administrative Officer have agreed to amend all discounted options held by them (other than those described in the next paragraph) to increase the exercise price to the average of the high and low trading price on the date determined by the Company to be the revised measurement date applicable to the option grant to be used for*

---

[1]    This practice is sometimes described as "spring-loading." Essentially, this manipulative practice entails selecting a grant date just prior to the disclosure of favorable, material news that insiders know will cause a corporation's stock price to immediately increase. Spring-loading, like backdating, defeats the stated purpose of incentive compensation plans in that the recipient of a spring-loaded option (just like a backdated option) is not assuming any true market risk as the options are, in effect, "in-the-money" at the time they are awarded.

*financial reporting purposes. In the few instances where these individuals have exercised options as to which a revised measurement date has been determined by the Company, the individuals have agreed to return to the Company the difference between the exercise price and the trading price on the revised measurement date.*

- *In the three instances where the Report of Investigation found that non-executive directors received options shortly before the public disclosure of positive information, the Company and these directors further agreed to amend such options to increase the exercise price to the average of the high and low trading price over the balance of the calendar year following the recorded date of the grant.*

23. Between 1997 and the present, Defendants had caused Children's Place to file false and misleading statements with the Securities and Exchange Commission ("SEC"), including Proxy Statements filed with the SEC which stated that the options granted by Children's Place carried with them an exercise price *that was not less than the fair market value of Children's Place stock on the date of grant* and issuance.

24. Defendants were aware, moreover, that the practices employed by the Board allowed the stock option grants to be *backdated* or otherwise manipulated to dates when the Company's shares were trading at or near the lowest price for that relevant period. In addition, certain option grant dates were selected knowing that upcoming disclosures would result in significant stock price increases. By September 2006, Defendants' backdating scheme had yielded stock option grants to the Company's executive officers worth millions of dollars.

25.    Defendants' misrepresentations and wrongful course of conduct violated the Securities Exchange Act of 1934 (the "Exchange Act"), as well as Delaware and New Jersey law.  By authorizing and/or acquiescing in the stock option backdating scheme, Defendants: caused Children's Place to issue false statements; diverted hundreds of millions of dollars of corporate assets to senior Children's Place executives; and subjected Children's Place to potential liability from regulators, including the SEC and the IRS.

26.    Defendants' gross mismanagement and malfeasance over the past decade has exposed Children's Place and its senior executives to criminal and civil liability for issuing false and misleading financial statements.    Specifically, Defendants caused or allowed Children's Place to issue statements that failed to disclose or misstated the following: that the Company had serious problems with its internal controls that prevented it from issuing accurate financial reports and projections; that because of improperly recorded stock-based compensation expenses, the Company's financial results violated Generally Accepted Accounting Principles ("GAAP"); and that the Company's public disclosures presented an inflated view of Children's Place's earnings and earnings per share.

27.    Defendants' malfeasance and mismanagement during the relevant period has wreaked millions of dollars of damages on Children's Place.    The Company's senior executives were incentivized to over-pay themselves, to profit from their misconduct by cashing in on under-priced stock options and to issue false

financial statements to cover up their misdeeds. Defendants' breaches of fiduciary duties in the administration of the Company's stock option plans so polluted the plans with grant date manipulations so as to void all grants made pursuant to the plans. This action seeks recovery for Children's Place against these faithless fiduciaries, as the Board, as currently composed, is simply unable or unwilling to do so.

## JURISDICTION AND VENUE

28.    The claims asserted herein arise under §14(a) of the Exchange Act, 15 U.S.C. §78n(a), and under New Jersey and Delaware law for breach of fiduciary duty, constructive fraud, waste of corporate assets, unjust enrichment and gross mismanagement. In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail and the facilities of a national securities market.

29.    This Court has subject matter jurisdiction pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §1331. This Court also has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367.

30.    This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

31.     Venue is proper in this district pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.  Children's Place is located in and conducts its business in this District.  Further, Defendants conduct business in this District, and certain of the Defendants are citizens of New Jersey and reside in this District.

## PARTIES

32.     Plaintiff Gail P. Nuttall ("Nuttall") residing at 21787 Vernon Ridge Drive, Ivanhoe, IL 60060 is, and has continuously been a shareholder of Children's Place since 2000.

33.     Plaintiff Leslie Lindeman ("Lindeman") residing at 574 Villa Zanita, Altadena, CA 91001 is, and has continuously been a shareholder of Children's Place since December 17, 1999.

34.     Nominal party Children's Place is a Delaware corporation with its executive offices and principal place of business located at 915 Secaucus Road, Secaucus, New Jersey.  According to its public filings, Children's Place is a leading specialty retailer of children's merchandise. The Company designs, contracts to manufacture and sells merchandise under the proprietary "The Children's Place" and licensed "Disney Store" brand names. As of January 5, 2008, the Company owned

and operated 912 The Children's Place stores and 337 Disney Stores in North America and its online stores at www.childrensplace.com and www.disneystore.com.

35.    Defendant Ezra Dabah ("Dabah") served as a director and as Chairman of the Board from 1989 until September 26, 2007. In addition, Dabah served as CEO of the Company from 1991 until September 2007. Moreover, defendant Dabah served as a member of the Board's Compensation Committee (the "Compensation Committee") from at least 1998 until 2003, and as a member of the Board's Audit Committee (the "Audit Committee") in 1999.

36.    Defendant Neal Goldberg ("Goldberg") served as President of Children's Place from January 2004 until his resignation on December 20, 2007.

37.    Defendant Seth L. Udasin ("Udasin") was the Company's Vice President, Finance, Chief Financial Officer ("CFO") and Treasurer from 1998 until 2005.

38.    Defendant Steven Balasiano ("Balasiano") joined Children's Place in December 1995, and served as the Company's Senior Vice President, Chief Administrative Officer, General Counsel and Secretary from November 2004 until January 31, 2007. Since January 31, 2007, defendant Balasiano has served as the Company's Senior Vice President with continued supervisory responsibility for real estate, store design, re-modeling and maintenance matters. From 2000 until September 2003, defendant Balasiano also served as the Company's Vice President, Human Resources.

39. Defendant Mario A. Ciampi ("Ciampi") is the Company's former Senior Vice President and the former President of Disney Stores, a licensed brand name of Children's Place, until his resignation in April 2006. Previously, Ciampi served as Vice President, Store Development from June 1996 until his promotion in July 2000 to Senior Vice President of Store Development and Logistics. He was named President of Disney Stores in November 2004.

40. Defendant Mark L. Rose ("Rose") has served as Senior Vice President and Chief Supply Chain Officer of Children's Place since 1997. Defendant Rose joined the Company in 1990, and served as the Company's Senior Product Buyer from 1990 until 1992. From 1992 until 1997, defendant Rose served as the Company's Vice President, Sourcing and Production.

41. Defendant Richard Flaks ("Flaks") has served as Senior Vice President, Planning, Allocation and Information Technology of Children's Place since November 2004. Flaks joined the Company in March 2003 as Vice President, Planning, Allocation and Information Technology and served in this capacity until his promotion to his current position.

42. Defendant Amy Hauk ("Hauk") has served as Senior Vice President, General Merchandise Manager, Disney Stores, the licensed brand name of Children's Place, since October 2005. Previously, Hauk served as Vice President, Merchandising of Children's Place from April 2002, until she was promoted to

Senior Vice President, General Merchandise Manager of Children's Place in November 2003. Hauk served in this capacity until her promotion in October 2005.

43.     Defendant Nina L. Miner (Miner") has served as Senior Vice President, Chief Creative Officer of the Company since 2005. Miner joined Children's Place as Vice President, Design and Product Development in 1990, and served in this capacity until she became Vice President, Trend Development in August 1998. In January 2001, she was promoted to Vice President, Design and Trend Development and served in this capacity until she was promoted in 2005 to her current position. Defendant Miner is the sister-in-law of defendant Dabah and is the daughter of defendant Silverstein.

44.     Defendant Malcolm L. Elvey ("Elvey") has been a director of Children's Place since 2002. In addition, defendant Elvey has served as a member of the Board's Audit Committee and as its Chairman since 2003. Moreover, defendant Elvey has served as a member of the Compensation Committee since 2003.

45.     Defendant Sally Frame Kasaks ("Kasaks") has been a director of Children's Place since 2000, and additionally has served as the Board's Lead Director since 2005 and as Acting Chairperson of the Board since September 26, 2007. Moreover, defendant Kasaks has served as a member of the Audit Committee since 2000 and as a member of the Compensation Committee since 2000.

46.     Defendant Charles K. Crovitz ("Crovitz") has been a director of Children's Place since 2004, and has additionally served as the Company's interim

CEO since September 26, 2007.  Moreover, defendant Crovitz has served as a member (Chairman) of the Compensation Committee since 2005.

47.    Defendant Robert Fisch ("Fisch") has been a director of Children's Place since 2004, and a member of the Audit Committee since 2005.

48.    Defendant Stanley Silverstein ("Silverstein") has been a director of Children's Place since 1996.  In addition, defendant Silverstein served as a member of the Board's Stock Option Committee (the "Option Committee") from 1999 until September 2003, when the Board dissolved the Option Committee.  Defendant Silverstein also served as a member of the Audit Committee from 1996 until 1998. Defendant Silverstein is the father-in-law of defendant Dabah.

49.    Defendant John F. Megrue ("Megrue") served as a director of Children's Place from July 1996 until September 2004.  Defendant Megrue was a member of the Compensation Committee from at least 1998 until September 2004, a member of the Option Committee from 1999 until September 2004, and a member of the Audit Committee from at least 1998 until 2002.

50.    Defendant David J. Oddi ("Oddi") served as a director of Children's Place from April 1997 until 2004.  Defendant Oddi additionally served as a member of the Audit Committee from 1999 until 2004.

51.    Defendant Diane Timbanard ("Timbanard") served as the Company's Vice President for Design and Product Development from 1990 until 2000.

52. Defendant Clark Hinkley ("Hinkley") served as the Company's Executive Vice President, Merchandise from February 1998 until 2001.

## DEFENDANTS' DUTIES

53. Each officer and director of Children's Place named herein owed the Company and Children's Place shareholders the duty to exercise a high degree of care, loyalty and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of Children's Place's directors and officers complained of herein involves knowing, intentional and culpable violations of their obligations as directors of Children's Place. Further, the misconduct of Children's Place's officers has been ratified by the Board, which has failed to take any legal action on behalf of the Company against them.

54. By reason of their positions as officers, directors and fiduciaries of Children's Place and because of their ability to control the business and corporate affairs of the Company, Defendants owed Children's Place and its shareholders fiduciary obligations of candor, trust, loyalty and care, and were required to use their ability to control and manage Children's Place in a fair, just, honest and equitable manner, and to act in furtherance of the best interests of Children's Place and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. In addition, as officers and/or directors of a publicly held company, Defendants had a duty to refrain from utilizing their control over

Children's Place to divert assets to themselves via improper and/or unlawful practices. Defendants also had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, earnings and compensation practices.

55.    Because of their positions of control and authority as directors or officers of Children's Place, each of the Defendants was able to and did, directly and indirectly, control the wrongful acts complained of herein.  These acts include: agreement to and/or acquiescence in Defendants' option backdating scheme; and willingness to cause Children's Place to disseminate false Proxy Statements for fiscal 1998-2006, which Proxy Statements failed to disclose Defendants' option backdating scheme and omitted the fact that executive officers were allowed to unilaterally backdate their stock options grants in order to manipulate the strike price of the stock options they received.  Because of their positions with Children's Place, each of the Defendants was aware of these wrongful acts, had access to adverse non-public information and was required to disclose these facts promptly and accurately to Children's Place shareholders and the financial markets but failed to do so.

56.    Between 1998 and 2006, *Defendants repeated in each Proxy Statement that the stock option grants made during that period carried an exercise price that was not less than the fair market value of Children's Place stock on the date granted, as calculated by the public trading price of the stock at the market's close on that date.*  However, Defendants concealed until September 2006 that the stock

option grants were repeatedly and consciously *backdated* or otherwise manipulated to ensure that the strike price associated with the option grants was at or near the lowest trading price for that fiscal period.  Plaintiffs seek to have all of the unexercised options granted to defendants between 1998 and 2005 cancelled, the financial gains obtained via the exercise of such options returned to the Company and to have Defendants revise the Company's financial statements to reflect the truth concerning all such option grants.

57.    To discharge their duties, the directors of Children's Place were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the business and financial affairs of Children's Place.  By virtue of such duties, the officers and directors of Children's Place were required, among other things, to:

(a)    manage, conduct, supervise and direct the business affairs of Children's Place in accordance with all applicable law (including federal and state laws, government rules and regulations and the charter and bylaws of Children's Place);

(b)    neither engage in self-dealing nor knowingly permit any officer, director or employee of Children's Place to engage in self-dealing;

(c)    neither violate nor knowingly permit any officer, director or employee of Children's Place to violate applicable laws, rules and regulations;

(d)     remain informed as to the status of Children's Place's operations, including its practices in relation to the cost of allowing the pervasive backdating and improperly accounting for such, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with Delaware law and the U.S. federal securities laws and their duty of candor to the Company's shareholders;

(e)     prudently protect the Company's assets, including taking all necessary steps to recover corporate assets (cash, stock options) improperly paid to Company executives and directors together with the related costs (professional fees) proximately caused by the illegal conduct described herein;

(f)     establish and maintain systematic and accurate records and reports of the business and affairs of Children's Place and procedures for the reporting of the business and affairs to the Board of Directors and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(g)     maintain and implement an adequate, functioning system of internal legal, financial and accounting controls, such that Children's Place's financial statements – including its expenses, accounting for stock option grants and other financial information – would be accurate and the actions of its directors would be in accordance with all applicable laws;

- 21 -

(h)    exercise control and supervision over the public statements to the securities markets and trading in Children's Place stock by the officers and employees of Children's Place; and

(i)    supervise the preparation and filing of any financial reports or other information required by law from Children's Place and to examine and evaluate any reports of examinations, audits or other financial information concerning the financial affairs of Children's Place and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

58.    Defendants breached their duties of loyalty and good faith by allowing or by themselves causing the Company to misrepresent its financial results and prospects, as detailed herein *infra*, and by failing to prevent the Defendants from taking such illegal actions. As a result of Defendants' illegal actions and course of conduct during the relevant period. Children's Place has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a)    improvidently paid executive compensation;

(b)    increased capital costs as a result of the loss of market capitalization and the Company's damaged reputation in the investment community;

(c)    costs incurred to carry out internal investigations, including legal fees paid to outside counsel; and

(d)   incurring possible IRS penalties for improperly reporting compensation.

59.   These actions have irreparably damaged Children's Place's corporate image and goodwill.  For at least the foreseeable future, Children's Place will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Children's Place's ability to raise equity capital or debt on favorable terms in the future is now impaired.

60.   The Company's Audit Committee Charter states that the primary purpose of the Audit Committee is to aid the Company's Board of Directors in undertaking and fulfilling its responsibilities for conservative, credible and accurate financial reporting to the public, to provide support for management's efforts to enhance the quality of the Company's controls and to provide appropriate avenues of communication between the Board of Directors and the Company's independent public accountants and internal auditors.

61.   The Audit Committee's specific responsibilities pursuant to the Audit Committee Charter include, *inter alia*:

*Review Procedures:*

•    Review the results of the quarterly reviews and the year-end audit of the Company, including:

The audit report, the published financial statements, the management representation letter, any report on accounting procedures and internal

controls prepared by the Company's independent public accountants, any other pertinent reports and management's responses thereto; Any material accounting issues among management, the Company's internal audit staff and the independent public accountants; and Other matters required to be communicated to the Committee under generally accepted auditing standards, as amended, by the independent public accountants.

•       Review with management and the independent public accountants such accounting principles and policies (and changes therein) of the Company, including any financial reporting issues which could have a material impact on the Company's financial statements as are deemed appropriate for review by the Committee prior to any interim or year-end filings with the SEC or other regulators.

•       Review and assess the adequacy of internal accounting procedures and controls, including a review with the independent auditors of their evaluation of the Company's internal controls. Review quarterly the programs that the Company has instituted to correct any control deficiencies noted by the director of internal audit in his or her periodic review or the independent auditors in their annual review. Discuss with management the results of the foregoing reviews, including significant items and potential ways to improve the accounting procedures and controls.

•       Periodically review with management, the independent auditors and the internal auditors the Company's financial reporting processes and internal audit controls and procedures to ensure the integrity and adequacy of such reporting processes, internal audit controls and procedures.

•       Meet with Company officers responsible for certifying the Company's financial reports as required under Section 302 of the Sarbanes-Oxley Act 2002 and discuss whether such officers are aware of (i) any significant deficiencies in the design or operation of internal controls which could adversely affect the issuer's ability to record, process, summarize, and report financial data, (ii) any material weaknesses in internal controls, or (iii) any fraud that involves management or other employees who have a significant role in the Company's internal controls.

*Legal Compliance*

- On at least an annual basis, meet with the Company's general counsel, and outside counsel when appropriate, to review legal and regulatory matters, if any, that may have a significant impact on the Company's financial statements, the Company's compliance with applicable laws and regulations, and inquiries received from regulators or governmental agencies.

*Other Audit Committee Responsibilities.*

- Review and approve the Company's Code of Business Conduct.

- Maintain minutes of Committee meetings and periodically report to the Board of Directors on significant results of the foregoing activities.

- Establish procedures for the receipt, retention and treatment of complaints regarding accounting, internal accounting controls or auditing matters, including procedures for the confidential, anonymous submissions by employees of concerns regarding questionable accounting or auditing matters.

- The Committee shall also undertake such additional activities within the scope of its primary function as the Committee may from time-to-time determine. The Committee shall have the authority to conduct any investigation appropriate to fulfilling its responsibilities, and it has direct access to the independent auditors as well as anyone in the organization. The Committee may retain independent counsel, accountants or other consultants or experts, at the Company's expense, to the extent considered necessary or appropriate by the Committee to assist it in the conduct of any investigation or the performance of its duties.

## REPORTING TO STOCKHOLDERS

The Company's annual proxy statement shall include a report of the Audit Committee (1) confirming that the Company has a formal, documented Audit Committee Charter setting forth the Committee's duties, (2) stating whether the Committee satisfied its obligations under the Charter during the previous year, and (3) covering all other matters required by Rules of the Securities and Exchange Commission. The proxy statement shall include the full text of the Charter at least once

every three years and after any significant modification is approved by the Board of Directors.

62.   The Company's Compensation Committee Charter states that the purpose of the Compensation Committee is to discharges the Board's responsibilities relating to total compensation of the Company's Chief Executive Officer and other senior management in a manner consistent with and in support of the business objectives of the Company, competitive practice and all applicable rules and regulations, including the granting of options and supervision of the Company's stock option plans.

63.   The Compensation Committee's specific responsibilities pursuant to the Compensation Committee Charter include, *inter alia*:

The Committee shall:

1.   Establish and review periodically the Company's overall management compensation policies and the goals and objectives relevant to the compensation of executive officers, including annual bonus and long-term performance and incentive goals and objectives, and approve any employment, severance, incentive and other compensatory agreements with any executive officer.

2.   Determine and recommend to the Board for approval, all aspects of compensation for the Chief Executive Officer of the Company ("CEO"), including, but not limited to: (a) reviewing corporate and individual goals and objectives relevant to CEO's compensation and an evaluation of the CEO's performance relative to those goals and objectives; and (b) in determining the incentive component of and the long-term total compensation of the CEO, considering the Company's performance, relative shareholder return, the value of incentive compensation given to CEO's at comparable companies, and the awards given to the CEO in past years.

3.     After considering proposals made by the CEO, determine and approve all aspects of compensation for the other executive officers of the Company (as defined in Commission Rule 16a-1(f)) and such other members of the Company's senior management as the Committee may from time to time designate.

4.     Consider the total compensation of all levels of employees within the Company when fulfilling its responsibilities under items 1, 2 and 3 above, in order to provide an appropriate context for making decisions at the senior management compensation.

5.     Make recommendations to the Board with respect to any equity award plan or program and any incentive compensation plan or program in which any member of senior management will participate. The plan governance role of the Committee will include the authority to make, approve, and ratify awards, including amendments to the awards made under any such plans, and to oversee the administration of and interpret such plans.

6.     Review and recommend the adoption of significant benefits plans relating to senior management and changes thereto to the Board of Directors.

7.     Review and discuss with management the Company's compensation discussion and analysis disclosure required by Commission regulations and determining whether to recommend to the Board that it be included in the Company's Annual Report on Form 10-K.

8.     Review and approve any related person transactions as defined in the Commission's rules (including the compensation of any employee who is a related person), establish such additional policies and procedures as it may consider appropriate to implement such review and approval policy, review at least annually any related person transactions of a continuing nature and institute such oversight and internal control procedures with respect to related person transactions as the Committee determines is appropriate and oversee the Company's related person transaction policies.

9.     Review competitive practice data regarding non-employee director compensation and make recommendations to the Board with respect to the amount and form of such compensation.

10.     Assume such other duties and responsibilities as may be assigned to the Committee, from time to time, by the Board of Directors of the Company and/or the Chairman of the Board.

## AIDING AND ABETTING AND CONCERTED ACTION

64.     In committing the wrongful acts alleged herein, Defendants have pursued or joined in the pursuit of a common course of conduct and acted in concert with one another in furtherance of their common plan.

65.     During all times relevant hereto, Defendants collectively and individually initiated a course of conduct which was designed to and did: (i) conceal the fact that the Company was allowing its directors and senior officers to divert millions of dollars to themselves and causing Children's Place to misrepresent its financial results; (ii) maintain Defendants' executive and directorial positions at Children's Place and the profits, power and prestige which Defendants enjoyed as a result of these positions; and (iii) deceive the investing public, including shareholders of Children's Place, regarding Defendants' compensation practices and Children's Place's financial performance.

66.     The purpose and effect of Defendants' common course of conduct was, among other things, to disguise Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, corporate waste and unjust enrichment, to conceal adverse information concerning the Company's operation and

- 28 -

financial condition and to artificially inflate the price of Children's Place common stock so they could dispose of millions of dollars of their own Children's Place stock, and enhance their executive and directorial positions and receive the substantial compensation they obtained as a result thereof.

67.    Defendants accomplished their common enterprise and/or common course of conduct by causing the Company to purposefully and/or recklessly engage in the option backdating scheme alleged herein and misrepresent Children's Place's financial results. Each of the Defendants was a direct, necessary, and substantial participant in the common enterprise and/or common course of conduct complained of herein.

68.    Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## FACTUAL BACKGROUND

69.    Children's Place is a specialty retailer of children's merchandise. According to its public filings, the Company designs, contracts to manufacture and sells high-quality, value-priced merchandise under its proprietary Children's Place

and licensed Disney Store brand names.  The Company is a specialty retailer of apparel and accessories for children from newborn to ten years of age.

70.    Throughout the relevant period, Defendants caused Children's Place to grant them millions of stock options permitting them to buy Children's Place stock for pennies on the dollar which they could in turn sell as the Company's stock price increased.  A stock option gives the holder the right to buy a stock at a certain price in the future.  Typically, companies set that price at the same time their directors approve an option grant, with an exercise price – also known as the "strike price" – usually set at the closing price of the stock that day, the closing price of the night before or by computing an average of the high and low prices on the day of the vote.

71.    However, many of the hundreds of thousands of options granted to Children's Place's executives had a hidden, valuable component:  they were backdated or otherwise manipulated, often making them even more significantly valuable.

72.    Under accounting rules in effect prior to 2004, public companies in the United States were permitted to grant stock options to employees without recording an expense, so long as the option's strike price was at or above the market's closing price for the stock on the day the options were granted.  If the option granted was priced below the market price on the date granted, known as an "in the money" option grant, SEC regulations required that any publicly traded company recognize and record the difference as a compensation expense in its financial statements. *See,*

*e.g.*, APB 25, superseded in 2004 by FAS 123(R).[2]  Accounting rules also required

that companies recognize the same compensation expense if "in the money" options

were granted to non-employees.  Thus while "in the money" stock options are more

valuable to those to whom they are granted, the additional expenses, if disclosed,

reduce the total amount of net income reported to shareholders of a publicly traded

company.

      73.    In addition, pursuant to Section 162(m), compensation in excess of $1

million per year, including gains on stock options, paid to a corporation's most

highly compensated officers is tax deductible only if: (i) the compensation is payable

solely on account of the attainment of one or more performance goals; (ii) the

performance goals are determined by a compensation committee comprised solely of

two or more outside directors, (iii) the material terms under which the compensation

is to be paid, including the performance goals, are disclosed to shareholders and

approved by a majority of the vote in a separate shareholder vote before the payment

of the compensation, and (iv) before any payment of such compensation, the

compensation committee certifies that the performance goals and any other material

terms were in fact satisfied.

---

[2] Pursuant to Accounting Principles Board Opinion No. 25 ("APB 25), the applicable GAAP provision at the time of the stock option grants enumerated herein, if the market price on the date of grant exceeds the exercise price of the options, the Company must recognize the difference as an expense.

74.    Since the date of the *Journal* article which first revealed the illegal practice of backdating stock options, more than 130 companies have reported internal and/or governmental investigations of their backdating practices. *Perfect Payday Options Scorecard, The Wall Street Journal* (updated regularly, available at http://online.wsj.com/public/resources/documents/info-optionsscore06-full.html).

75.    Additional research by Professor Lie suggests that between 1996 and 2005, 18.9% of unscheduled "in the money" option grants to top executives were backdated or otherwise manipulated, by nearly one-third of the companies investigated.

76.    As the scrutiny over historical stock option practices has intensified, backdating has been revealed not only as a practice to maximize the grant recipients' gain, while concealing company expenses, but also as a tax avoidance vehicle for some executives. Reporting on an analysis written by an economist at the SEC, the *San Jose Mercury News* reported, "[i]n a new wrinkle in the scandal over backdating stock options, an analyst has found evidence that some executives manipulated the exercise dates of their options in order to cheat on their taxes." Marcy Gordon, SEC: Backdating Done to Avoid Paying More Taxes, San Jose Mercury News, December 13, 2006, available online at http://www.mercurynews.com/search/ci_4831931.

77.    For at least the past decade, stock options have been a popular form of executive compensation, supposedly because they help align executive interests with those of the shareholders. Unfortunately, in practice, the granting of stock options to

- 32 -

senior management frequently did not have the desired effect. Far too frequently, options sometimes caused managers to look for ways to drive up stock prices in the short term through acquisitions, asset sales, or even fraud, rather than by effectively managing existing businesses for long term success, as many shareholders would prefer.

78.    Although compensation experts continue to debate whether or not these risks outweigh the incentives stock options are intended to provide, the use of stock options as another place to hide lavish and unprecedented executive compensation has become readily apparent in recent years.

79.    Specifically, beginning in March 2006 and continuing through the present, numerous companies have been revealed to have participated in options backdating. While executives are benefited through options backdating by giving them the ability to exercise those options at lower prices than they otherwise could, such fraudulent and illegal schemes disadvantage the issuer of the stock by, among other things, bringing less money into the company upon the exercise of the options.

80.    Additionally, although companies may take tax deductions for option-related expense when the options are exercised, any amounts that bring compensation for certain individuals over $1 million in any year are deductible only if the expense is "performance-related." Awards of "in-the-money" stock options do not qualify as "performance-related" compensation for these purposes, and therefore expenses relating to the exercise of those options (the market price on the exercise date less the

- 33 -

exercise price) are not deductible.  By backdating option grants and deducting options-related expense associated with the exercise of those options, companies increase their tax liabilities at the time the options are exercised and may be subject to penalties as a result.

81.    The fallout from options backdating scandals has already resulted in criminal charges against corporate executives from several companies, while investigations by the SEC and federal prosecutors are ongoing with respect to numerous other companies.

### The Company's Stock Option Plans During the Relevant Period

82.    According to the Company's public filings, stock options were issued during the relevant period pursuant to incentive Stock Option Plans (the "Plans") approved by the Company's shareholders and administered by the Board, the Stock Option Committee (from 1999 through 2003), and the Compensation Committee.

83.    Each of the Company's reported Plans in effect during the relevant period provides that *the measurement of the exercise price of stock options was to be based on the fair market value on the date the option was granted*.  The Company's relevant various stock option and other compensation plans are summarized in Children's Place's financial filings as follows:

### 1997 Stock Option Plan

84.    As described in the Company's Annual Report on Form 10-K filed with the SEC and disseminated to shareholders on May 1, 1998, the essential features of the 1997 Stock Option Plan (the "1997 Plan") are as follows:

> [The] 1997 Plan [is] administered by a committee of the Board of Directors (the "Committee"). Options granted under the...1997 Plan have exercise prices established by the Committee *provided that the exercise price of incentive stock options may not be less than the fair market value of the underlying shares at the date of grant*.

85.    Defendants further represented therein that:

> The Company accounts for its...1997 Stock Option Plan (the "1997 Plan")...under the intrinsic value method described in the provisions of Accounting Principles Bulletin No. 25, "Accounting for Stock Issued to Employees" ("APB 25"). Accordingly, *no compensation expense has been recognized for stock-based compensation, since the options granted were at prices that equaled or exceeded their estimated fair market value at the date of grant*.

86.    Defendants made substantially similar representations regarding the terms and features of the 1997 Plan in each and every subsequent Annual Report on Form 10-K filed with the SEC and disseminated to shareholders throughout the relevant period.

**2005 Equity Incentive Plan**

87.    Beginning with the Company's Annual Report on Form 10-K filed with the SEC and disseminated to shareholders on April 12, 2006, Defendants also made nearly identical representations regarding the essential features of the Company's 2005 Equity Incentive Plan (the "2005 Plan") as well. For example, Defendants represented that:

In accordance with SFAS No. 123, "Accounting for Stock-Based Compensation" ("SFAS 123") and the disclosure requirements of SFAS No. 148, "Accounting for Stock-Based Compensation, Transition and Disclosure" ("SFAS 148"), the Company accounts for...its 1997 Stock Option Plan (the "1997 Plan") [and] its 2005 Equity Incentive Plan (the "2005 Plan") (collectively, the "Plans")...under the intrinsic value method described in the provisions of Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB 25") and related accounting interpretations. *Accordingly, since options were granted at prices that equaled or exceeded their estimated fair market value at the date of grant, no compensation expense was recognized at the date of the grant.*

## ANALYSIS OF SUSPICIOUS STOCK OPTION GRANTS AWARDED AT CHILDREN'S PLACE

88.     During the relevant period, numerous options grants to multiple Children's Place executives and directors were backdated, spring-loaded, or otherwise manipulated, as the pattern of grants was more than fortuitous and often fell on days in which the Company's stock traded at or near period lows.

89.     In addition to the academic research that has extensively covered the prevalence of backdating schemes in recent years, Merrill Lynch & Co., Inc. ("Merrill Lynch") has built upon the academic research by developing a method of analyzing options grants and comparing the returns from such grants to the average investor returns in the same period as a strong indicator of whether backdating likely occurred.  To that end, Merrill Lynch published an analysis of options grants made at various companies in a report dated May 22, 2006 as further evidence that the returns enjoyed by options grantees at many companies were not by mere chance.  The report analyzes the 20 (twenty) day performance of each option grant reported in a

company's proxy statements during the relevant backdating period. The analysis also calculates the annualized return of the option grants at twenty days after the grant and compares that annualized return with the company's overall annual return.[3]

90.     An application of the Merrill Lynch analysis for the grants made to Defendants during the relevant period further indicates that the grants were very likely to have been backdated, spring-loaded, or otherwise manipulated, given the vast discrepancies between the annualized management and annualized investors returns.

91.     During the relevant period, the Compensation Committee, the Option Committee, and the Board knowingly and deliberately violated the terms of the Plans, APB 25 and Section 162(m) by knowingly and deliberately backdating or otherwise manipulating grants of stock options to make it appear as though the grants were made on dates when the market price of Children's Place stock was lower than the market price on the actual grant dates, thereby unduly benefiting the recipients of the manipulated options.

92.     The members of the Board who were not on the Compensation Committee or the Option Committee had actual knowledge of the backdating or other manipulation of grant dates and knew that it violated the terms of the Plans, APB 25

_____

[3] Analysis results rounded off to the nearest whole decimal.

and Section 162(m). All Board members knew that the publicly reported grant dates and statements that the Company followed APB 25 and granted stock options with exercise prices not less than the fair market value of Children's Place stock on the date of grant were false because the grants were, in fact, backdated or otherwise manipulated. Furthermore, the entire Board knowingly and deliberately approved the stock option backdating scheme with knowledge of its consequences, *e.g.*, its effects on Children's Place's financial statements.

93.    During the relevant period, Defendants repeated in the Company's proxy statements that the stock option grants made during that period carried exercise prices ***"equal to the fair market value of the Common Stock"*** on the date the option was granted. However, Defendants concealed until 2007 that the stock option grants were, in fact, repeatedly and consciously backdated, spring-loaded, and otherwise manipulated to ensure that the strike prices associated with option grants were below fair market value on the date of grant.

94.    Upon information and belief, the Board members, Option Committee members, and Compensation Committee members who issued the grants, and certain Defendants (as listed herein) and others who received each grant, would review historical stock prices before issuing stock options to determine the date upon which stock prices were significantly below the current market price, and then falsify the relevant documents to make it appear as if the stock options were granted on the earlier date.

95.    As a result, the executives or directors to whom the options were granted could realize the gain observed between the historical and actual grant date while the Company's records would appear to show no difference between the option price and the market price on the purported date of the grant, thereby avoiding both the reporting requirement and the additional compensation expense.

96.    Further, and as admitted by Defendants, on multiple occasions, Children's Place insiders *"selected grant dates with a view toward upcoming disclosures."*    In other words, Defendants have admitted to repeated instances of spring-loading options, by intentionally selecting grant dates shortly before sharp increases in the Company's stock price resulting from the disclosure of favorable, material news.

97.    Certain of Children's Place's manipulative stock option grants are described below:

### 1998 Option Grants

98.    Defendants purportedly awarded option grants to top Children's Place officers as of October 21, 1998 at $9.75 per share, right before two highly-positive news reports caused a material increase in the Company's stock price. *Indeed, on November 3, 1998, the Company's stock price rose to $12.00 per share following*

*an analyst's upgrade[4] of Children's Place stock to "buy," and two days later, on November 5, 1998, Defendants caused the Company to announce an unexpectedly large sales increase for the third fiscal quarter of 1998.*

99.    Just twenty trading days following the purported October 21, 1998 grant date, in light of the upgrade of Children's Place stock and the Company's positive disclosure regarding its sales increases, the price of Children's Place stock climbed to $13.88 per share.  Defendants Hinkley, Miner, and Timbanard received 200,000, 10,000 and 25,000 options, respectively, at this $9.75 exercise price.

100.    Applying the Merrill Lynch analysis for this option grant, *the average twenty day return is 42.4%, or 8,313.6% annualized, as compared to a 390.6% annualized return to Children's Place investors in 1998 – a difference of 7,923%.*

### 2000 Option Grants

101.    Defendants dated many of Children's Place's 2000 option grants to top officers as of July 11, 2000 at $20.31 per share – near the lowest closing price of Children's Place stock for the month.  By the very next day, July 12, 2000, *Children's Place  stock price would increase by more than $6 per share to close at $26.44 per share, after analysts upgraded Children's Place stock to a "strong buy",* and would reach the price of $29.00 per share just 20 trading days following the

---

[4] It is customary for analysts to present pending reports to a corporation's senior management so that any factual errors may be corrected prior to the release of the report.

purported grant date. Defendant Ciampi received 25,000 options at this $20.31 exercise price.

102.   Applying the Merrill Lynch analysis for this option grant, *the average twenty day return is 40.2%, or 6,262.7% annualized, as compared to a 23.2% annualized return to Children's Place investors in 2000 – a difference of 6,239.5%*.

103.   Later that year, Defendants purportedly dated other Children's Place option grants to top officers as of November 8, 2000 at $19.03 per share. As the *Journal* would report years later, *this purported grant date was immediately preceded by a sharp decline in the Company's stock price (nearly 29% in only a week) attributed to two negative news reports, a patent-infringement lawsuit filed against the Company and an analyst's ratings cut*. Indeed, the closing price of Children's Place stock on November 8, 2000 was the *lowest closing price in nearly seven months*.

104.   As also noted by the *Journal,* on November 9, 2000, the day after the purported November 8, 2000 grant date, Defendants caused Children's Place to announce earnings in line with estimates and make other favorable comments about its business prospects, causing the stock price to materially increase. Within days, the Company's stock price reached $22.00 per share and reached a high of $26.50 per share by the end of November 2000. Defendants Ciampi, Miner, Rose, and Timbanard received 15,000, 12,000, 18,000 and 10,000 options, respectively, at this $19.03 exercise price.

105.   Applying the Merrill Lynch analysis for this option grant, *the average twenty day return is 38.6%, or 5,457.7% annualized, as compared to a 23.2% annualized return to Children's Place investors in 2000 – a difference of 5,434.5%.*

### 2001 Option Grants

106.   Defendants purportedly awarded option grants to top officers as of November 1, 2001 at $23.94 – again, right before a material increase in the Company's stock price.  Indeed, just two weeks after the purported grant date, on November 15, 2001, *Defendants caused the Company to announce that its financial results had exceeded Wall Street estimates*, driving the Company's stock price to $32.14.

107.   Just twenty trading days following the purported grant date, Children's Place stock closed with a price of $34.90 per share.  Defendants Ciampi, Miner, Rose and Udasin received 18,000, 12,000, 12,000, and 12,000 options, respectively, at this $23.94 exercise price.

108.   Applying the Merrill Lynch analysis for this option grant, *the average twenty day return is 43.7%, or 8,894% annualized, as compared to a 34.1% annualized return to Children's Place investors in 2001 – a difference of 8,859.9%.*

### 2003 Option Grants

109.   Defendants awarded option grants purportedly dated August 15, 2003, at $17.48 per share, the *lowest closing price of the stock for the month of August 2000.*  This purported grant date was immediately preceded by a material decline in

the Company's stock price, and was immediately followed by a material increase in the stock price.

110.   Only two weeks prior to the purported grant date, on August 1, 2003, the Company's stock price had been $21.28 per share.  Just two weeks after the purported grant date, on August 29, 2003, the Company's stock price would climb to more than $21.00 per share.  Defendant Flaks received 20,000 options at the $17.48 exercise price.

111.   Applying the Merrill Lynch analysis for this option grant, *the average twenty day return is 15.3%, or 499.6% annualized, as compared to a 151.2% annualized return to Children's Place investors in 2003 – a difference of 348.4%.*

112.   Defendants also dated approximately 22,000 options as of September 30, 2003, at $17.42 per share, again right before a material increase in the Company's stock price.  Indeed, a little over a week later, on October 10, 2003, *Defendants caused Children's Place to issue a press release announcing "record" September 2003 sales*, quickly driving the stock price to over $28 per share.

113.   Within 20 trading days of the purported grant date, Children's Place stock closed with a price of $30.29 per share.  Defendant Elvey received 6,000 options at the $17.42 exercise price, while defendant Kasaks received 16,000 options at the $17.42 exercise price.

114.   Applying the Merrill Lynch analysis for this option grant, *the average twenty day return is 75.6%, or 120,355.9% annualized, as compared to a 151.2%*

- 43 -

*annualized return to Children's Place investors in 2003 – a difference of 120,204.7%.*

### 2005 Option Grants

115.   Children's Place issued certain suspicious option grants in 2005, which would later be specifically identified by former SEC Chief Accountant Lynn Turner in his testimony regarding stock options backdating before the Senate Banking, Housing and Urban Affairs Committee, as well as by the *Journal.* Children's Place purportedly issued options for 270,000 shares, dated April 29, 2005, with exercise prices of $37.66, *the lowest closing price of Children's Place stock for the month.* Within one week of the purported April 29, 2005 grant date, the stock price climbed to $46 per share, because, as noted by the *Journal,* on May 5, 2006, Children's Place increased its earnings forecast for the year by five cents per share, ahead of analysts' estimates. 20 trading days following the purported grant date, the stock price reached $47.23 per share. In addition, defendants Balasiano (55,000 options), Ciampi (80,000 option) and Goldberg (85,000) delayed reporting their grants with the SEC until May 20, 2005, contrary to the requirements of federal law.

116.   Children's Place also issued a grant purportedly dated April 29, 2005 of 85,000 shares to defendant Dabah. Although Dabah's options were priced at $41.42 (110% of the stated fair market value), they also resulted in a quick windfall. Like defendants Balasiano, Ciampi, and Goldberg, defendant Dabah also delayed reporting this grant award until May 20, 2005.

117.   Applying the Merrill Lynch analysis for this option grant, *the average twenty day return is 26.9%, or 1,917.6% annualized, as compared to a 33.5% annualized return to Children's Place investors in 2005 – a difference of 1,884.1.%*.

118.   Below are charts demonstrating certain of Children's Place's stock option grants which occurred prior to material stock price increases:





**The Childrens Place Retail Stores**

September 28, 2001 - November 30, 2001



**The Childrens Place Retail Stores**

June 9, 2000 - August 11, 2000

## STOCK OPTION BACKDATING AT CHILDREN'S PLACE FINALLY COMES TO LIGHT

119.  On September 7, 2006, Defendants caused the Company to issue a press release and subsequently file a Form 8-K with the SEC announcing that it would be delaying the filing of its Form 10-Q for the quarter ended July 29, 2006, as a result of an internal investigation into the Company's historical stock option granting practices.  The release stated in part:

> The Children's Place Retail Stores, Inc. announced today that it will delay the filing of its Quarterly Report on Form 10-Q for the quarter ended July 29, 2006 with the Securities and Exchange Commission. This delay will allow time for the Company to complete an analysis of the accounting treatment for its past stock option grants and to determine the extent of any corrections that may be required to its previously reported financial results.

> On August 24, 2006, at the request of the Company's audit committee, the Company's outside counsel began an investigation into the Company's stock option practices. Outside counsel delivered its findings to the audit committee on September 6, 2006. *The investigation found various instances in which the Company's records did not correctly reflect the legal grant date for stock options granted to employees and directors of the Company, resulting in errors in the dating of these stock options. The report concluded that, except for one occasion in 2001, as to which the report was inconclusive, the errors in the granting and recording of stock options were unintentional.*

> The Company is currently engaged in an analysis of the accounting treatment of its stock option grants since its initial public offering in 1997 to determine the extent of any corrections that may be required to its previously reported financial results. The Company cannot predict when this analysis will be completed. While the Company expects that some corrections to its reported financial results will be necessary, it is not yet able to estimate the aggregate amount of any such corrections or whether such corrections would be material. Accordingly, the Company

has not yet determined whether any corrections would be made by recording a non-cash charge to earnings for the second quarter of 2006, or whether it may be necessary to restate its previously filed financial statements for prior fiscal years and the first quarter of fiscal 2006.

120.   Despite Defendants' unsurprising conclusion that they had not engaged in any "intentional misconduct", on September 22, 2006, the *Journal* published an article regarding the historical option grant practices at Children's Place and specifically warned that "**investors may want to probe a little further into the company's options story**." The *Journal* explained that:

> *A review of options grants to the company's executives shows a number of those awards were made at low points for the stock price, sometimes accompanied by major delays in filing paperwork on the grants with the Securities and Exchange Commission. In one case, more than two months elapsed between the grant and the SEC filing, which is supposed to be made within two business days.*

> *                   *          *          *

> Some Children's Place executives have reaped large profits by exercising the options from these grants and selling the shares.

> Regulators are also looking at options-dating practices known as "spring-loading" and "bullet-dodging," on which options grants are timed to take advantage of news that either boosts the stock price or holds down the option's exercise price.

> *Some grants to Children's Place executives appear to have been issued at propitious times, shortly before good news or after bad news pushed the stock around.*

> But Leah Townsend, an analyst at research firm Glass Lewis & Co. who has spotlighted some of the Children's Place options issues, said, "I have a hard time putting together why, if it's coincidence, these grants happened when they did."

One grant spotlighted by Ms. Townsend was made on April 29, 2005, to Chairman and Chief Executive Ezra Dabah and at least four other top executives for options representing a total of at least 355,000 shares. But the forms publicly disclosing the grant weren't filed with the SEC until May 20, three weeks later. Rules enacted after the 2002 Sarbanes-Oxley corporate-governance act require all options grants to be disclosed in SEC filings within two business days.

The price of Children's Place stock on that grant date, $37.21, was among the lowest posted that quarter by the company. The stock price rose after the grant date, gaining just under 26% between April 29 and May 20.

A significant piece of news helped fuel that rise: On May 5, Children's Place boosted its earnings forecast for the year by 5 cents a share. The stock rose 6.6% that day alone.

*So by the time the options grant – with a low price beneficial to the recipients – was disclosed, the stock had already jumped, helped by good news. That jump made it more likely the options would be in the money and profitable to holders once they vested.*

To be sure, the April 2005 grant also has a twist that supports the company's contention of no deliberate backdating: The exercise price was $37.66, higher than the day's $37.21 close that most companies would use. The same pattern holds true for some other Children's Place grants: If a company were deliberately gaming the options grant by backdating, why not use the lowest possible price? But Children's Place may have been locked into the higher price, because its stock-option plan calls for options to be granted at the average of the grant date's high and low trading prices, not at the closing price.

*A second well-timed grant cited by Ms. Townsend came on Aug. 13, 2004, when Mr. Dabah, the CEO, got a grant of options for 100,000 shares. The stock's closing price that day was among the lowest that year, although Mr. Dabah's exercise price was slightly higher because the company's options plan calls for a higher strike price for options granted to a major shareholder. The SEC filing wasn't made until Oct. 22, more than two months later; by then, Children's Place stock had soared 57%, or almost 40% above Dabah's higher grant price.*

- 49 -