COHN LIFLAND PEARLMAN
 HERRMANN & KNOPF LLP
PETER S. PEARLMAN
JEFFREY W. HERRMANN
Park 80 Plaza West-One
Saddle Brook, NJ  07663
Telephone:  201/845-9600
201/845-9423 (fax)

THE WEISER LAW FIRM, P.C.
ROBERT B. WEISER
BRETT D. STECKER
JEFFREY J. CIARLANTO
121 N. Wayne Avenue, Suite 100
Wayne, PA 19087
Telephone:  610/225-2677
610/225-2678 (fax)

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| GAIL P. NUTTALL and LESLIE LINDEMAN, Derivatively on Behalf of THE CHILDREN'S PLACE RETAIL STORES, INC., <br><br> Plaintiff, <br><br> vs. <br><br> EZRA DABAH, et al., <br><br> Defendants, <br><br> – and – <br><br> THE CHILDREN'S PLACE RETAIL STORES, INC., a Delaware corporation, <br><br> Nominal Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Case No. 2:07-cv-121
(SDW) (MCA)

Hon. Susan D. Wigenton,
U.S.D.J.

**PLAINTIFFS' BRIEF IN SUPPORT OF PROPOSED SETTLEMENT AND AWARD OF ATTORNEYS' FEES AND EXPENSES**

# TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................................ 2

II.     FACTUAL AND PROCEDURAL BACKGROUND ...................................... 4

III.    TERMS AND BENEFITS OF THE SETTLEMENT ...................................... 6

    A.    MONETARY RELIEF ................................................................................ 6

    B.    CORPORATE GOVERNANCE RELIEF ............................................................ 7

IV.    NOTICE TO TCP SHAREHOLDERS ......................................................... 11

V.     THE SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE AND SHOULD
         BE APPROVED BY THE COURT ............................................................. 12

    A.    STANDARD OF REVIEW ......................................................................... 12

    B.    THE SETTLEMENT IS FAIR, ADEQUATE AND REASONABLE .......................... 13

    C.    FACTORS SUPPORTING THE SETTLEMENT .................................................. 14

         1.     *The Risks of Establishing Liability* ........................................................ 15

         2.     *The Risks in Establishing Damages* ...................................................... 18

         3.     *Complexity, Expense, Risk, and Duration of Further Litigation* .............................. 19

         4.     *The Reaction of Current TCP Stockholders Also Supports a Finding That The*
            *Settlement Should Be Approved* ..................................................... 21

         5.     *Opinion of Plaintiffs' Counsel* ........................................................... 22

         6.     *Conclusion* ........................................................................... 23

VI.    PLAINTIFFS' COUNSELS' UNOPPOSED FEE AWARD IS FAIR AND
         REASONABLE AND SHOULD BE APPROVED ...................................... 23

    A.    UNOPPOSED FEES IN LITIGATION ARE IDEAL .............................................. 24

    B.    APPLICABLE LEGAL STANDARDS ............................................................. 26

    C.    THE FEE AWARD IS FAIR AND REASONABLE IN LIGHT OF THE RESULTS OBTAINED .. 27

D.     THE FEES AND EXPENSES ARE FAIR AND REASONABLE IN LIGHT OF OTHER PERTINENT FACTORS ........................................................................................ 28

    1.     *The Time, Effort, and Expense Expended by Plaintiffs' Counsel Strongly Supports the Fees and Expenses* .............................................................................. 28

    2.     *The Contingent Nature of Plaintiffs' Counsel's Undertaking Justifies the Fee Award* ................................................................................................................ 31

    3.     *Standing and Ability of Plaintiffs' Counsel* ................................................... 32

    4.     *The Fact that No Current TCP Stockholder Has Objected to the Fees and Expenses Also Supports their Fairness* ...................................................... 32

    5.     *Public Policy* .................................................................................................... 33

VII.     THE INCENTIVE AWARDS FOR THE PLAINTIFFS SHOULD BE APPROVED ........................................................................................................ 34

VII.     CONCLUSION ............................................................................................... 35

## TABLE OF AUTHORITIES

**Cases**

*Allied Artists Pictures Corp. v. Baron,*
    413 A.2d 876 (Del. 1980)................................................................................... 24

*Aronson v. Lewis,*
    473 A.2d 805 (Del. 1984)................................................................................... 14

*Bacas v. Way,*
    2008 WL 746825 (S.D. Tex. Apr. 1, 2008) ........................................................ 26

*Backman v. Polaroid Corp.,*
    910 F.2d 10 (1st Cir. 1990) ................................................................................ 19

*Barkan v. Armsted Indus. Inc.,*
    567 A.2d 1279 (Del. 1989)................................................................................. 11

*Beam v. Stewart,*
    845 A.2d 1040 (Del. 2004)................................................................................. 14

*Behrens v. Wometco Enterprises, Inc.,*
    118 F.R.D. 534 (S.D. Fla. 1988) ....................................................................... 29

*Bell Atl. Corp. v. Bolger,*
    2 F.3d 1304 (3d Cir. 1993)................................................................................. 12

*Berkey Photo, Inc. v. Eastman Kodak Co.,*
    603 F.2d 263 (2d Cir. 1979)............................................................................... 19

*Blum v. Stenson,*
    465 U.S. 886 (1984) .......................................................................................... 28

*Boyd v. Bechtel Corp.,*
    485 F. Supp. 610 (N.D. Cal. 1979) ................................................................... 21

*Bryan v. Pittsburgh Plate Glass Co.,*
    494 F.2d 799 (3d Cir. 1974)............................................................................... 11

*Chiulli v. Hardwicke Cos., Inc.,*
    1985 WL 11532 (Del. Ch. 1985)........................................................................ 20

*Chrysler Corp. v. Dann*
    223 A.2d 384 (Del. Ch. 1966) ...................................................................... 25, 29

*Citron v. Burns*,
    1985 Del. Ch. LEXIS 382 (Del. Ch. Feb. 4, 1985). .................................................. 12

*City of Detroit v. Grinnell Corp.*,
    495 F.2d 448 (2d Cir. 1974) .................................................................................... 10

*Cohn v. Nelson*,
    375 F. Supp. 2d 844 (E.D. Mo. 2005) ............................................................... 12, 24

*Conley v. Sears, Roebuck and Co.*,
    1998 U.S. Dist. LEXIS 7503 (D. Mass. 1998) ...................................................... 29

*Denney v. Jenkens & Gilchrist*,
    2005 WL 388562 (S.D.N.Y. Feb. 18, 2005) ......................................................... 32

*Desimone v. Barrows*,
    924 A.2d 908 (Del. Ch. 2007) ................................................................................ 14

*Emerald Partners v. Berlin*,
    787 A.2d 85 (Del. 2001) .......................................................................................... 30

*Goldberger v. Integrated Res., Inc.*,
    209 F.3d 43 (2d Cir. 2000). .................................................................................... 28

*Greenspun v. Bogan*,
    492 F.2d 375 (1st Cir. 1974) .................................................................................. 20

*Grunin v. Int'l House of Pancakes*,
    513 F.2d 114 (8th Cir. 1975) ........................................................................... 11, 20

*Hensley v. Eckerhart*,
    461 U.S. 424 (1983) ................................................................................................ 22

*In re Anderson Clayton S'holders Litig.*,
    1988 WL 97480 (Del. Ch. Sept. 19, 1988) ............................................................ 27

*In re Beverly Hills Fire Litig.*,
    639 F. Supp. 915 (E.D. Ky. 1986) ......................................................................... 29

*In re Boston and Maine Corp. v. Sheehan, Phinney, Bass & Green, P.A.*,
    778 F.2d 890 (1st Cir. 1985) .................................................................................. 29

*In re Bristol-Myers Squibb Deriv. Litig.*,
    2005 WL 447189 (S.D.N.Y. 2005) ........................................................................ 24

iv

*In re Caremark Int'l Inc.,*
  698 A.2d 959 (Del. Ch. 1996) ................................................................................ 12

*In re Cendant Corp. Deriv. Litig.,*
  232 F. Supp.2d 327 (D.N.J. 2002) ......................................................................... 33

*In re CNET Networks, Inc. S'holder Deriv. Litig.,*
  483 F. Supp.2d 947 (N.D. Cal. 2007) .................................................................... 14

*In re Computer Sciences Corp. Deriv. Litig.,*
  2007 WL 1321715 (C.D. Cal. Mar. 26, 2007) ....................................................... 14

*In re Comverse Technology, Inc. Deriv. Litig.,*
  No. 601272/06, slip. op. (N.Y. Sup. Ct. Aug. 14, 2007); ..................................... 14

*In re Dun & Bradstreet Credit Servs. Customer Litig.,*
  130 F.R.D. 366 (S.D. Ohio 1990) .......................................................................... 32

*In re F5 Networks, Inc.,*
  2007 WL 2476278 (W.D. Wash. Aug. 6, 2007) ..................................................... 14

*In re Family Dollar, Inc. S'holder Deriv. Litig.*
  2007 WL 2669699 (W.D.N.C. Aug. 13, 2007) ....................................................... 26

*In re Finisar Corp. Deriv. Litig.,*
  2008 WL 131867 (N.D. Cal. Jan. 11, 2008) .......................................................... 14

*In re Ikon Office Solutions, Inc.,*
  194 F.R.D. 166 (E.D. Pa. 2000) ............................................................................. 29

*In re Infinity Broadcasting Corp.,*
  802 A.2d 285 (Del. 2002) ....................................................................................... 12

*In re Infosonics Corp. Deriv. Litig.,*
  2007 WL 2572276 (S.D. Cal. Sept. 4, 2007) ......................................................... 14

*In re Linear Technology Corp. Deriv. Litig.,*
  2006 WL 3533024 (N.D. Cal. Dec. 7, 2006) ......................................................... 14

*In re Lloyd's Am. Trust Fund Litig.,*
  2002 U.S. Dist. LEXIS 22663 (S.D.N.Y. Nov. 26, 2002) ..................................... 17

*In re MIPS Technologies, Inc. Deriv. Litig.,*
  2008 WL 131915 (N.D. Cal. Jan. 11, 2008) .......................................................... 14

v

*In re MAXXAM Group, Inc.,*
    1987 WL 10016 (Del. Ch. 1987)...............................................................................25

*In re Nat'l Student Marketing Litig.,*
    68 F.R.D. 151 (D.D.C. 1974)................................................................................21

*In re New Mexico Natural Gas Antitrust Litig.,*
    607 F. Supp. 1491 (D. Colo. 1984)......................................................................31

*In re Openwave Systems S'holder Deriv. Litig.,*
    2007 WL 1456039 (N.D. Cal. May 17, 2007) ....................................................14

*In re Openwave Systems, Inc.,*
    2007 WL 1456039 (N.D. Cal. 2007);...................................................................15

*In re Oracle Sec. Litig.,*
    852 F. Supp. 1437 (N.D. Cal. 1994) ....................................................................24

*In re Ortiz Estate,*
    27 A.2d 368 (Del. Ch. 1942)................................................................................13

*In re PaineWebber Ltd. P'ships Litig.,*
    171 F.R.D. 104  (S.D.N.Y. 1997) .......................................................................17

*In re PMC-Sierra, Inc. Deriv. Litig.,*
    2007 WL 2427980 (N.D. Cal. Aug. 22, 2007)....................................................14

*In re Prodigy Commc'n Corp. S'holders Litig.,*
    2002 Del. Ch. LEXIS 95 (Del. Ch. 2002)...........................................................25

*In re Remeron End-Payor,*
    2005 WL 2230314 (D.N.J. 2005).........................................................................33

*In re SmithKline Beckman Corp. Sec. Litig.,*
    751 F. Supp. 525 (E.D. Pa. 1990) ..................................................................20, 33

*In re Staples, Inc. S'holder Litig.,*
    792 A.2d 934 (Del. Ch. 2001)..............................................................................26

*In re Texaco, Inc.,*
    20 F. Supp. 2d 577 (S.D.N.Y. 1998)....................................................................12

*In re Verisign, Inc. Deriv. Litig.,*
    531 F. Supp.2d 1173 (N.D. Cal. 2007) ................................................................14

*In re Walt Disney Co., Derivative Litigation,*
   907 A.2d 693 (Del. Ch. 2005)............................................................................................... 15, 30

*In re Warner Communications Sec. Litig.,*
   618 F. Supp. 735 (S.D.N.Y. 1985)........................................................................................ 19, 31

*In re Xcel Energy, Inc.,*
   364 F. Supp.2d 980 (D. Minn. 2005) .................................................................................... 33

*Johnson v. Georgia Highway Express, Inc.,*
   488 F.2d 714 (5th Cir. 1974)................................................................................................. 23

*Kahn v. Lynch Commc'n. Sys., Inc.,*
   669 A.2d 79 (Del. 1995)......................................................................................................... 30

*Kahn v. Sullivan,*
   594 A.2d 48 (Del. 1991)......................................................................................................... 11

*Kamen v. Kemper Fin. Services, Inc.,*
   500 U.S. 90 (1991) ................................................................................................................. 10

*Karstedt v. Isenberg,*
   4:2007cv00509 (S.D. Tex. May 14, 2008)............................................................................. 26

*Krinsky v. Helfand,*
   156 A.2d 90 (Del. 1959)......................................................................................................... 11

*Paine Webber R&D Partners, L.P. v. Centocor, Inc.,*
   1999 Del. Ch. LEXIS 48 (Del. Ch. 1999). ........................................................................... 13

*Levine v. Smith,*
   591 A.2d 194 (Del. 1991)....................................................................................................... 14

*Maher v. Zapata Corp,.*
   714 F.2d 436 (5th Cir. 1983).............................................................................................. 18, 26

*Malchman v. Davis,*
   761 F.2d 893 (2d Cir. 1985)................................................................................................... 23

*Maurer v. Int'l Reinsurance Corp.,*
   95 A.2d 827 (Del. 1953)......................................................................................................... 24

*McKittrick v. Gardner,*
   378 F.2d 872 (4th Cir. 1967).............................................................................................. 28, 29

vii

*Miller v. Republic Nat'l Life Ins. Co.,*
   559 F.2d 426 (5th Cir. 1977)...................................................................................... 20

*Mills v. Electric Auto Lite Co.,*
   396 U.S. 375 (1970) ..................................................................................................... 24

*Neponsit Inv. Co. v. Abramson,*
   405 A.2d 97 (Del. 1979)............................................................................................... 10

*Nottingham Partners v. Dana,*
   564 A.2d 1089 (Del. 1989).......................................................................................... 10

*Ochs v. Ruttenberg,*
   446 F. Supp. 145 (S.D.N.Y. 1978).............................................................................. 31

*The Officers for Justice, et al. v.The Civil Service Commission of the City and County of San*
   *Francisco,*
   688 F.2d 615 (9th Cir. 1982)...................................................................................... 24

*Packard v. Provident Nat'l Bank,*
   994 F.2d 1039 (3d Cir. 1993) ...................................................................................... 19

*Polk v. Good,*
   507 A.2d 531 (Del. 1986)............................................................................................. 10

*Prandini v. National Tea Co.,*
   557 F.2d 1015 (3d Cir. 1977) ...................................................................................... 22

*Prezant v. DeAngelis,*
   636 A.2d 915 (Del.1994).............................................................................................. 10

*Pridgen v. Andresen,*
   2000 WL 863053 (D. Conn. Mar. 31, 2000).............................................................. 24

*Production Resources Group, L.L.C. v. NCT Group, Inc.,*
   863 A.2d 772 (Del. Ch. 2004) ..................................................................................... 16

*Raider v. Sunderland,*
   2006 WL 75310 (Del. Ch. Jan. 5, 2006) .................................................................... 33

*Ressler v. Jacobson,*
   149 F.R.D. 651 (M.D. Fla. 1992) ............................................................................... 30

*Risberg v. McArdle,*
   529 F. Supp.2d 213 (D. Mass. 2008) .......................................................................... 14

*Rome v. Archer,*
  197 A.2d 49 (Del. 1964)................................................................................. 20

*Ryan v. Gifford,*
  918 A.2d 341 (Del. Ch. 2007)....................................................................... 16

*Schleiff v. Chesapeake & Ohio Railway Co.,*
  43 F.R.D. 175 (S.D.N.Y. 1967)..................................................................... 21

*Seinfeld v. Coker,*
  847 A.2d 330 (Del. Ch. 2000)....................................................................... 27

*Seinfeld v. Robinson,*
  246 A.D.2d 291 (N.Y. App. 1st Dep't 1998)................................................. 26

*Steiner v. Fruehauf Corp.,*
  121 F.R.D. 304 (E.D. Mich. 1988)................................................................ 24

*Stoetzner v. U.S. Steel Corp.,*
  897 F.2d 115 (3d Cir. 1990).......................................................................... 20

*Sugarland Indus. v. Thomas,*
  420 A.2d 142 (Del. 1980).............................................................................. 11

*Swacker v. Pennroad Corp.,*
  57 A.2d 63 (Del. 1947).................................................................................. 25

*Trans World Airlines, Inc. v. Hughes,*
  312 F. Supp. 478 (S.D.N.Y. 1970)................................................................ 19

*Unite Nat'l Retirement Fund v. Philip Watts,*
  2005 WL 2877899 (D.N.J. October 28, 2005).............................................. 24

*Wandel v. Eisenberg,*
  No. 603665/06, slip. op. (N.Y. Sup. Ct. May 2, 2007) ................................ 14

*Weiner v. Roth,*
  791 F.2d 661 (8th Cir. 1986)......................................................................... 31

*Weiss v. Mercedes-Benz of North America, Inc,*
  899 F. Supp. 1297 (D.N.J. 1995) ............................................................ 18, 28

*Weiss v. Swanson,*
  2008 WL 623324 (Del. Ch. Mar. 7, 2008).................................................... 15

**Rules**

Del. Ch. Ct. R. 23.1…………………………………………………………………………………18

Fed. R. Civ. P. 23.1…………………………………………………………………………..18, 36

Fed. R. Civ. P. 12(b)(6)………………………………………………………………………..36

**Other Authorities**

*Court Awarded Attorney's Fees,*
    Report of the Third Circuit Task Force, 108 F.R.D. 237 (1985)…………….…….........…..27

## INTRODUCTION

Plaintiffs Gail P. Nuttall ("Nuttall") and Leslie Lindeman ("Lindeman") (collectively, "Plaintiffs") respectfully submit this brief in support of their application for approval of the proposed settlement (the "Settlement") of the above-captioned shareholder derivative action (the "Action").[1]

Plaintiffs are very pleased to present the Settlement for this Court's final approval. The Settlement was the culmination of nearly a year and half's worth of litigation and arm's-length negotiations among experienced and esteemed counsel who comprehensively understood and debated the merits of the Action. Plaintiffs believe that the Settlement is an excellent result for The Children's Place Retail Stores, Inc. ("TCP" or the "Company") and Current TCP Stockholders, particularly in light of the significant challenges Plaintiffs faced with the continued prosecution of the Action.

Plaintiffs' Counsel advised Plaintiffs to enter into the Stipulation only after approximately sixteen (16) months of litigation and research, to determine the strengths and weaknesses of Plaintiffs' claims, all of which supported the fairness of the proposed Settlement. Plaintiffs' Counsel have conducted an extensive investigation during the development and prosecution of the Action. This investigation has included, *inter alia*: (1) inspecting, reviewing and analyzing the Company's financial filings; (2) researching corporate governance issues; (3) participating in teleconferences with Defendants' Counsel; (4) researching the applicable law

---

[1] This brief incorporates by reference the entirety of the parties' Stipulation of Settlement dated as of May 21, 2008 (the "Stipulation" or "Stip."). Unless otherwise herein defined, all capitalized terms used herein shall have the same meanings as set forth in the Stipulation.

2

with respect to the claims asserted in the Action and the potential defenses thereto; and (5) employing a financial expert to conduct an analysis of the option grants at issue.

On May 29, 2008, the Court entered a Preliminary Approval Order (the "Preliminary Order") directing that a final settlement hearing be held on July 21, 2008 (the "Settlement Hearing") to determine the fairness, reasonableness, and adequacy of the Settlement and the Fee Award. Pursuant to the Preliminary Order, Notice of the Settlement was filed with the Securities and Exchange Commission (the "SEC") by TPC in the form of an attachment to a Report on Form 8-K on June 5, 2008. *See* Declaration of Virginia H. Johnson Regarding Publication of the Notice of Proposed Settlement of Derivative Litigation, Hearing Thereon, and Right to Appear ("Johnson Aff."), previously submitted (Doc. No. 49). In addition, pursuant to the Preliminary Order, Summary Notice of the Settlement was published in *Investor's Business Daily* on June 17, 2008. *See* Affidavit of Publication of Anthony Hall ("Hall Aff.") previously submitted (Doc. No. 50 Exhibit "B"); *see also* Declaration of Robert B. Weiser Regarding Publication of the Summary Notice of Proposed Settlement of Derivative Litigation, Hearing Thereon, and Right to Appear ("Weiser Compliance Aff."), previously submitted (Doc. No. 50).

The Notices[2] contained detailed descriptions of the history of the Action and the proposed Settlement, the claims that will be released if the proposed Settlement is approved, and the Fee Award sought by Plaintiffs' Counsel. The Notices further disclosed the time and place of the Settlement Hearing and advised Current TCP Stockholders of the procedures for objecting to the proposed Settlement and/or Fee Award. To date, and despite the fact that TCP has thousands of stockholders, Plaintiffs' Counsel are unaware of any objections to the proposed

---

[2] Jointly, the Notice and the Summary Notice shall be referred to herein as the "Notices."

3

Settlement or to the Fee Award, which is very strong evidence that they are fair, reasonable, and adequate.

As demonstrated below, the efforts of Plaintiffs and their counsel in asserting and prosecuting the Action were a factor in the Company's decisions to adopt valuable remedial measures and corporate governance policies that are directly related and responsive to the contentions made in the Action. These material benefits fully justify this Court's approval of the Settlement as fair and reasonable and, in light of the extensive and successful services rendered by Plaintiffs' Counsel in prosecuting and resolving the Action, the Fee Award.[3]

## I. FACTUAL AND PROCEDURAL BACKGROUND

TCP is a Delaware corporation with its executive offices and principal place of business located at 915 Secaucus Road, Secaucus, New Jersey. According to its public filings, TCP is a leading specialty retailer of children's merchandise. The Company designs, contracts to manufacture and sells merchandise under the proprietary "The Children's Place" and licensed "Disney Store" brand names.

On September 7, 2006, the Company announced that it would be delaying the filing of its Report on Form 10-Q for the fiscal quarter ended July 29, 2006, as a result of an internal investigation into the Company's historical stock option granting practices commenced by the audit committee (the "Audit Committee") of the Board. *See* Stip. at 2. On November 30, 2006, the Company announced that the Board had formed a special committee (the "Special Committee") to continue the independent investigation commenced by the Audit Committee. *Id.* The Special Committee was assisted by independent counsel in its review of the Company's stock option practices. *Id.*

---

[3] *See* the affidavits of Robert B. Weiser ("Weiser Fee Aff.") and Peter S. Pearlman ("Pearlman Fee Aff.") submitted herewith.

The Action was initiated on January 9, 2007, when plaintiff Nuttall filed the above-caption shareholder derivative action in this Court. *Id.* Generally, Nuttall alleged that the Individual Defendants (certain of the Company's current and former officers and directors)[4] breached their fiduciary duties to the Company because, *inter alia*, they allegedly caused backdated, spring-loaded, or otherwise manipulated stock options to be granted to several of the Company's senior officers and directors over a multi-year period. *Id.* at 2-3.

On January 31, 2007, the Company issued a press release announcing the results of the Special Committee's investigation. *Id.* at 3. Among other things, the press release stated that, based on the results of the Special Committee's independent investigation and the Company's own additional review, the Company's management had concluded that "incorrect measurement dates were used for financial reporting purposes in respect to option grants." *Id.* In the press release, the Company also announced that, in light of the Special Committee's findings, it would restate its previously issued financial statements for fiscal years 2003-2005 and for the first fiscal quarter of 2006. *Id.*

On March 19, 2007, TCP and the Individual Defendants moved to dismiss the Action. *Id.* On June 15, 2007, plaintiff Nuttall filed a First Amended Verified Shareholder Derivative Complaint. *Id.* On August 23, 2007, the Court entered an Order setting a schedule for plaintiff Nuttall to file a Second Amended Verified Shareholder Derivative Complaint, which was based on the anticipated filing of TCP's restated financial results. *Id.* On December 5, 2007, the Company filed its restatement and, on February 4, 2008, plaintiff Nuttall filed a Second

---

[4] Individual Defendants include the following: Ezra Dabah ("Dabah"), Neal Goldberg ("Goldberg"), Seth L. Udasin ("Udasin"), Steven Balasiano ("Balasiano"), Mario A. Ciampi ("Ciampi"), Mark L. Rose ("Rose"), Richard Flaks ("Flaks"), Amy Hauk ("Hauk"), Nina L. Miner ("Miner"), Malcolm L. Elvey ("Elvey"), Sally Frame Kasaks ("Kasaks"), Charles K. Crovitz ("Crovitz"), Robert Fisch ("Fisch"), Stanley Silverstein ("Silverstein"), John F. Megrue ("Megrue"), David J. Oddi ("Oddi"), and Clark Hinkley ("Hinkley").

5

Amended Verified Shareholder Complaint. *Id.* Plaintiff Nuttall was joined in doing so by plaintiff Lindeman. *Id.*

After extensive arms-length negotiations over the ensuing months, nominal defendant TCP, the Individual Defendants, and Plaintiffs in the Action, by and through their respective attorneys, engaged in good faith discussions with regard to the possible settlement of the Action and, after additional communications between and among counsel for the Settling Parties, counsel for the Settling Parties reached an agreement in principle providing for the Settlement. The Settling Parties ultimately executed the Stipulation on May 21, 2008.

As discussed in detail herein, Plaintiffs submit that the proposed Settlement represents an excellent result for TCP and Current TCP Stockholders, and therefore should be approved.

## II.   TERMS AND BENEFITS OF THE SETTLEMENT

As briefly discussed above, the Settlement provides several categories of relief to the Company, which individually and collectively provide substantial benefits to TCP and current TCP Stockholders.

### A.   Monetary Relief

The filing of the Action was among the factors considered in the Board's decision to re-price certain of the Company's historical option grants and require payment to the Company of certain monies, and to take other remedial actions.[5] Specifically, the Company and its former Chief Executive Officer ("CEO"), its former President, and its former Chief Administrative Officer ("CAO") agreed to amend each of such individuals' outstanding options that vested before 2005 to increase the exercise price to the trading price on the correct measurement date

---

[5] The remedial measures discussed herein were taken pursuant to the recommendations of the Special Committee and were announced in the Company's January 31, 2007 press release.

for the option grants for financial reporting purposes as determined by the Company.[6]  In addition, with respect to one option held by one of such individuals that previously had been exercised, that individual agreed to pay to the Company the difference between the exercise price and the higher amount of the trading price on the correct measurement date as determined by the Company.

Furthermore, any non-management director who received an option grant that was not implemented in accordance with "best practices" has agreed to increase further the exercise price of such options to the average of the highest and lowest closing price of the shares during the remainder of the year of grant, even though such price may be above the trading price on the correct measurement date of the grant.

### B.    Corporate Governance Relief

The filing of the Action was among the factors considered in the Board's decision to implement, *inter alia*, the following corporate governance and internal controls reforms:

- The positions of Chair of the Board and CEO have been separated, and one of the independent directors was appointed to serve as non-executive Chair of the Board;

- The person who served as the Chair of the Board relinquished that position but retained his position as the Company's CEO (until September 24, 2007);

- The new position of Executive Vice President, Finance and Administration has been established, reporting to the CEO and to the Board.  Responsibilities of this position include serving, along with the

---

[6] Previously, in December 2006, each such individual agreed to increase to the same extent the exercise price of each outstanding option he held that had vested after 2005.

7

CEO, as principal executive officer of the Company in making certifications of the Company's SEC reports and with respect to similar matters, and supervising the Company's finance, treasury, accounting, legal and human resource functions;

- The person who served as the Company's CAO, General Counsel and Secretary, relinquished these responsibilities, but he continued to serve as a Senior Vice President with supervisory responsibility for the Company's real estate, construction and facilities, store design, and non-merchandise purchasing (until July 20, 2007);

- The Company has retained a new General Counsel, has hired a Senior Vice President, Finance, who has become the Chief Financial Officer ("CFO"), and has filled substantially all open positions in its accounting department;

- The Board commenced a search to expand the Board to include two (2) new independent directors; and

- The Board has commenced a comprehensive review, with the assistance of independent counsel, of the Company's governance system and processes and its internal controls.[7]

In addition, and as announced in the January 31, 2007 press release and disclosed in the Company's Form 10-K filed on December 5, 2007, under the supervision of the Board's Compensation Committee (the "Compensation Committee"), the Company has instituted more

---

[7] These corporate governance and internal controls reforms were also recommended by the Special Committee and announced in the Company's January 31, 2007 press release. They were thereafter adopted and implemented by the Board and by TCP's management.

rigorous policies, procedures and practices governing the approval and granting of stock options and other equity incentive awards and related accounting and internal controls. The Board in June 2007 adopted a formal Policy Regarding Awards of Equity-Based Incentives to Executive Officers and Other Employees. Consistent with that policy, procedures, practices and controls to the following effect will generally be applied to all such grants:

- Grants will be dated on the date that all required approvals have been obtained or a future date, not later than one month after the approval date, specified when approval is given. The exercise price for each option granted will not be less than the closing price of the Company's stock on the date of grant;

- Equity grants will generally be approved only at duly convened, regularly scheduled meetings of the Compensation Committee or pursuant to a formal, limited delegation by the committee of grant-making authority to a committee of specified senior officers, as discussed below. Minutes of such meetings will be kept which shall reflect the specifics of any equity grants approved at the meeting. If in extenuating circumstances grants are to be made by unanimous written consent of the members of the Compensation Committee, the grant date will be no earlier than the date the last member signs the consent and the consent is received by the Company. The Company will no longer use "as of" dating for written consents approving equity grants;

9

- All grants made to executive officers will be specifically approved by the Compensation Committee as will grants to employees in other positions designated by the Compensation Committee;

- If the making of any grants to non-executives is to be delegated to a committee of senior officers, the overall terms of such grants will be approved in advance by the Compensation Committee. Terms will include annual limits as to the number of shares subject to all such delegated grants including a limit as to the number of shares available for grant to any particular employee and may include guidelines for grants that may be made to specified levels of employees. Actions taken pursuant to delegated authority will be required to be in writing, dated and signed by the executive(s) delegated authority to make the grant and will be regularly reported to the Compensation Committee;

- Annual grants will be considered and approved by the Compensation Committee at its meeting most closely preceding or following the first meeting of the Board following the filing of the Company's Annual Report on Form 10-K. The same grant date will apply to annual grants made to executive officers and other employees;

- Designated members of the Company's legal and accounting staffs will oversee the documentation, accounting and disclosure of all equity awards. Standard forms will be established and used for grant documentation (*e.g.*, option agreements and award notices);

10

- Recipients will be advised of awards within a reasonable time period after the grant date; and

- There will be no changes to grants after approval, other than to withdraw a grant to an individual in its entirety to reflect changes in circumstances between approval and issuance or to correct clear clerical errors. Any other changes will require approval in accordance with the requirements for making new grants.

In addition, specifically to address matters identified by management in assessing the Company's controls in connection with the Form 10-K filed on December 5, 2007, as described in detail in Item 9A of the Form 10-K filed on April 2, 2008, the Company's management and its Audit Committee since December 2007 have taken numerous steps to strengthen the Company's internal control over financial reporting.

## III.   NOTICE TO TCP SHAREHOLDERS

Pursuant to the Preliminary Order, the Company filed the Notice with the SEC as an attachment to a Report on Form 8-K on June 9, 2008. *See* Johnson Aff. In addition, pursuant to the Preliminary Order, Plaintiffs' Counsel published the Summary Notice in *Investor's Business Daily* on June 17, 2008. *See* Hall Aff. and Weiser Compliance Aff.

The Notices contained detailed descriptions of the history of the Action and the proposed Settlement, the claims that will be released if the proposed Settlement is approved, and the Fee Award sought by Plaintiffs' Counsel. The Notices further disclosed the time and place of the Settlement Hearing and advised TCP shareholders of the procedures for objecting to the proposed Settlement and/or Fee Award. To date, Plaintiffs' Counsel are unaware of any objections to the proposed Settlement or to the Fee Award. As discussed herein, the lack of any

11

objections by any of TCP's thousands of stockholders strongly supports the fairness and reasonableness of the Settlement and the Fee Award.

## IV. THE SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE AND SHOULD BE APPROVED BY THE COURT

### A. Standard of Review

TCP is incorporated in Delaware, and thus its law applies to all substantive aspects of the Action, including the standard for settlement review. *Kamen v. Kemper Fin. Services, Inc.*, 500 U.S. 90 (1991). Delaware courts have long favored the voluntary settlement of contested claims. *See  e.g.*, *Nottingham Partners v. Dana*, 564 A.2d 1089, 1102 (Del. 1989; *Polk v. Good*, 507 A.2d 531, 535 (Del. 1986); *Neponsit Inv. Co. v. Abramson*, 405 A.2d 97, 100 (Del. 1979). Settlements are particularly favored in complex shareholder actions because they promote judicial economy. *See  Prezant v. DeAngelis*, 636 A.2d 915, 922-23 (Del.1994). With respect to the law's policy favoring settlement, that policy will only be served by final approval of this Settlement so that, aside from the benefits flowing to the Company, the judicial system and the parties may move on without further litigation and expense.

Federal Rule 23.1 (like Delaware's Chancery Court Rule 23.1) requires court approval of a shareholder derivative action settlement or dismissal. *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974). The Court's function in reviewing a proposed settlement is to evaluate the facts and circumstances that bear on the reasonableness of the proposed settlement. *Prezant*, 636 A.2d at 921. In its evaluation of a settlement, the Court need not try the issues or decide the

merits of the case.  *Id.*[8]  Rather, as set forth more-fully below, the Court must consider the nature

of the claims, the possible defenses to the claims, the legal and factual obstacles to be faced by

the plaintiffs at trial, and the delay, expense and complexity of litigation.  *Kahn v. Sullivan*, 594

A.2d 48, 59 (Del. 1991).   Because a settlement represents an exercise of judgment by the

negotiating parties, the function of a judge reviewing a settlement is neither to rewrite the

settlement agreement reached by the parties nor to try the case by resolving issues intentionally

left unresolved.  *See Polk*, 507 A.2d at 536.[9]  Where, as here, the parties have thoroughly

investigated the factual background of the case, vigorously advanced their respective views of

the strengths and weaknesses of the case, negotiated at arm's length and in good faith to arrive at

a settlement whereby Plaintiffs have obtained valuable benefits for TCP and Current TCP

Stockholders, the Settlement should be approved.  *See Barkan v. Armsted Indus. Inc.*, 567 A.2d

1279, 1281 (Del. 1989); *Sugarland Indus. v. Thomas*, 420 A.2d 142, 147 (Del. 1980).

### B.   The Settlement is Fair, Adequate and Reasonable

The Settlement is clearly fair, adequate and reasonable to TCP and Current TCP

Stockholders.  Indeed, it is an excellent result for the Company and Current TCP Stockholders in

light of the challenges that Plaintiff would have faced going forward with the prosecution of this

Action.  In the context of the alleged wrongdoing, the Settlement provides lasting benefits to

TCP through the long-term[10], remedial, therapeutic benefits outlined above, which are

---

[8]  *See Krinsky v. Helfand*, 156 A.2d 90, 94 (Del. 1959) (noting that the court is not to "try the issues of the case" because "any such requirement would defeat the purpose of the settlement itself.")

[9]  *Accord Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799, 804 (3d Cir.), *cert. denied*, 419 U.S. 900 (1974); *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 124-24 (8th Cir.), *cert. denied*, 423 U.S. 864 (1975).

[10]  Notably, unlike many other settlements of this type, there is no "sunset" provision on the corporate governance enhancements the Company has agreed to adopt to resolve the Action.  Thus, these changes are permanent, and will not be phased out after the expiration of a certain amount of time.

13

specifically designed to protect and preserve TCP for the benefit of the Company and its shareholders. *See generally*, *In re Caremark Int'l Inc.*, 698 A.2d 959, 966 (Del. Ch. 1996). Indeed, the establishment of a previously non-required corporate governance procedure or mechanism (as will be accomplished by the Settlement proposed here) provides significant benefits to the nominal defendant in a derivative suit. *See Citron v. Burns*, C.A. No. 7647, 1985 Del. Ch. LEXIS 382, at *6 (Del. Ch. Feb. 4, 1985).[11] For this reason, courts regularly approve non-pecuniary settlements tailored to the improprieties alleged. *See In re Texaco, Inc.*, 20 F. Supp.2d 577, 584-85 (S.D.N.Y. 1998). Here, the Settlement provisions are specifically designed to minimize the probability of future violations of fiduciary duties and damages to the Company, not only relating to stock option backdating, but in all other aspects as well.[12] As a result of the implementation of the Settlement terms, TCP will be less likely to become subject to long and costly litigation in the future.[13] TCP's conformance to the law, regulations, and high standards of business ethics required by the prophylactic measures of the Settlement is fully expected to preclude a repetition of the consequences of the violations alleged. Consequently, the Settlement should be approved.

---

[11] Indeed, federal courts interpreting state law (usually, Delaware law) have reached this same conclusion on numerous occasions. *See Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1311 (3d Cir. 1993) (collecting cases from the Second, Fourth, Fifth, and Sixth Circuits and finding that remedial measures are an adequate basis for settlement of, and judicial approval of derivative settlements).

[12] *See In re Infinity Broadcasting Corp.*, 802 A.2d 285 (Del. 2002) (holding that the settlement's future impact on the corporation is properly considered in evaluating a proposed settlement and that it would be reversible error for a court to only consider the immediate tangible results in determining the fairness of a proposed settlement).

[13] *See e.g.*, *Cohn v. Nelson*, 375 F. Supp. 2d 844, 854-55 (E.D. Mo. 2005), applying Delaware law in approving the settlement of shareholder's derivative action finding that:

> The Settlement's Corporate Governance reforms specifically designed to minimize the probability of violations of fiduciary duties and federal securities laws in the future. As a result of the implementation to the settlement's corporate governance changes, [the corporation] is far less likely to become subject to long and costly securities litigation in the future, as well as prosecution or investigation by regulators and prosecutors.

14

## C.    Factors Supporting the Settlement

Generally, Delaware courts, in reviewing a proposed settlement of shareholder derivative litigation, (as in virtually every jurisdiction) make a determination as to whether to the settlement is "fair, reasonable and adequate." *See Polk*, 507 A.2d at 536.  Although there is no "bright-line" test that courts employ in making the "fair, reasonable and adequate" determination, some factors that the Delaware courts typically review in this regard are: (1) the risks of establishing liability; (2) the risks of establishing damages; (3) the complexity, expense, risk and duration of further litigation; (4) the reaction of the affected shareholders to the proposed settlement; and (5) the views of counsel.[14]

Here, application of the foregoing factors strongly supports approval of the Settlement. Indeed, the Settlement, which provides for monetary consideration and which materially enhances TCP's corporate governance practices, more than fairly, reasonably, and adequately resolves Plaintiffs' claims.  In light of the substantial challenges that continued litigation of the Action would present, Plaintiffs respectfully submit that the Settlement represents an excellent result for TCP and Current TCP Stockholders.

### 1.    The Risks of Establishing Liability

Complex shareholder litigation is always uncertain, and the Action was no different. Plaintiffs, to recover on the Company's claims at trial, would have had to, *inter alia*, demonstrate that making a pre-suit demand on the Board was "futile" and that the Individual Defendants' actions were not the product of valid business judgment.  Satisfying both tests would have been a significant challenge for Plaintiffs.

---

[14] *Id.*; *see also In re Ortiz Estate*, 27 A.2d 368, 374 (Del. Ch. 1942); *PaineWebber R&D Partners, L.P. v. Centocor, Inc.*, 1999 Del. Ch. LEXIS 48, *50 (March 15, 1999).

15

Here, Plaintiffs *did not* make a demand on the Board to commence the Action. Thus, absent Settlement, there is, at the least, an open question as to whether Plaintiffs would have standing to bring claims on the Company's behalf. In order to pursue their claims, Plaintiffs would first have to establish that demand on the Board was excused as a matter of law. *See, e.g., Aronson v. Lewis*, 473 A.2d 805 (Del. 1984). Establishing demand futility is always an uncertain proposition, particularly where, as here, a significant portion of the Board consists of "outside" directors. *See, e.g., Beam v. Stewart*, 845 A.2d 1040, 1048-52 (Del. 2004); *Levine v. Smith*, 591 A.2d 194, 197-208 (Del. 1991). Indeed, as Plaintiffs' Counsel can attest through their own substantial personal experience in this area of the law, the pre-suit demand requirement is no empty procedural test.

Over the past two years, there have been numerous corporations that have announced governmental investigations related to their historical option granting practices, and these investigations in turn have produced a flurry of derivative lawsuits. The overwhelming majority of the actions that have been filed in virtually every court have been dismissed on demand futility grounds,[15] including cases where the subject corporation has *admitted* that it improperly awarded backdated or otherwise manipulated options.[16]

---

[15] *See, e.g., In re Linear Technology Corp. Deriv. Litig.*, 2006 WL 3533024 (N.D. Cal. Dec. 7, 2006); *In re Openwave Systems S'holder Deriv. Litig.*, 2007 WL 1456039 (N.D. Cal. May 17, 2007); *In re Computer Sciences Corp. Deriv. Litig.*, 2007 WL 1321715 (C.D. Cal. Mar. 26, 2007); *In re F5 Networks, Inc.*, 2007 WL 2476278 (W.D. Wash. Aug. 6, 2007); *In re PMC-Sierra, Inc. Deriv. Litig.*, 2007 WL 2427980 (N.D. Cal. Aug. 22, 2007); *In re CNET Networks, Inc. S'holder Deriv. Litig.*, 483 F. Supp.2d 947 (N.D. Cal. 2007); *In re Infosonics Corp. Deriv. Litig.*, 2007 WL 2572276 (S.D. Cal. Sept. 4, 2007); *In re Verisign, Inc. Deriv. Litig.*, 531 F. Supp.2d 1173 (N.D. Cal. 2007); *Risberg v. McArdle*, 529 F. Supp.2d 213 (D. Mass. 2008); *In re Finisar Corp. Deriv. Litig.*, 2008 WL 131867 (N.D. Cal. Jan. 11, 2008); *In re MIPS Technologies, Inc. Deriv. Litig.*, 2008 WL 131915 (N.D. Cal. Jan. 11, 2008); *Desimone v. Barrows*, 924 A.2d 908 (Del. Ch. 2007); *In re Comverse Technology, Inc. Deriv. Litig.*, No. 601272/06, slip. op. (N.Y. Sup. Ct. Aug. 14, 2007); *Wandel v. Eisenberg*, No. 603665/06, slip. op. (N.Y. Sup. Ct. May 2, 2007). *See* Compendium of Non-Published Orders, submitted herewith.

[16] See, e.g., *CNET*, 483 F. Supp.2d at 947; *Comverse*, No. 601272/06, slip. op.

16

Here, Individual Defendants have denied that options were intentionally backdated or spring-loaded at TCP, even though they have stated, *inter alia,* that "incorrect measurement dates were used for financial reported purposes in respect to option grants" and that there were "errors in the dating of options and other irregularities in option grants." Thus, although Plaintiffs believe that they had strong demand futility allegations in the Action[17], Plaintiffs' Counsel are also aware that similar allegations in other shareholder derivative actions have failed. *See, e.g., In re Openwave Systems, Inc.,* 2007 WL 1456039 (N.D. Cal. 2007); *Risberg,* 529 F. Supp.2d at 213. It was clear that, at the least, Plaintiffs faced a challenge in adequately alleging, and then proving, demand futility. Thus, Plaintiffs believed that there was a possibility that the Action might never have progressed beyond the pleading stage, and that the merits of their claims might never have been presented to any Court.[18]

Even assuming Plaintiffs had adequately alleged demand futility, they still would have had to overcome the protections afforded the Board under the so-called "business judgment rule." The business judgment rule generally affords a strong presumption that, in making a disinterested business decision, the directors of a Delaware corporation acted on an informed basis, in good faith, and with the honest belief that the action taken was in the best interests of the corporation. *Disney,* 907 A.2d at 746-47; *Aronson,* 473 A.2d at 812. Although Plaintiffs believed in their arguments against the protections afforded by the rule with respect to the acts challenged in the Action,[19] the prospect that Individual Defendants could have been shielded by this protective umbrella made establishing liability in the Action uncertain.

---

[17] *See, e.g., Weiss v. Swanson*, 2008 WL 623324 (Del. Ch. Mar. 7, 2008).

[19] For example, if Plaintiffs could have proved that a director awarded himself options with the benefit of hindsight, then the protections of the business judgment rule would not apply. *Ryan,* 918 A.2d at 357-58.

17

All of the reasons set forth above lend support to the proposition that a positive resolution of the Action was uncertain. That Plaintiffs were able to achieve a Settlement in the face of these obstacles is a testament to the Settlement's fairness and reasonableness, and thus strongly suggests that the Settlement should be approved.

### 2.    The Risks in Establishing Damages

Even if Plaintiffs were successful in establishing liability, to establish damages at trial, they would have had to prove, *inter alia*, that the claims in the Action actually caused TCP to suffer non-exculpated damages and that Individual Defendants, as a matter of law, could be held liable for those damages. Under traditional applications of Delaware law, Plaintiffs faced a formidable challenge establishing and collecting monetary damages in the Action.

Undoubtedly, Individual Defendants would have argued that, at most, Plaintiffs alleged "due care" oversight claims. Because TCP's Articles of Incorporation contain an exculpatory clause for such claims, permissible under 8 Del. C. § 102(b)(7), Plaintiffs may have ultimately proved their claims, only to see the Individual Defendants exculpated. *See, e.g., Production Resources Group, L.L.C. v. NCT Group, Inc.*, 863 A.2d 772, 799 (Del. Ch. 2004). Plaintiffs believe they could have asserted strong arguments against the application of a due care analysis to their claims (particularly with respect to those Individual Defendants who either received or awarded allegedly backdated options), but the possibility that some or all of their claims could have been characterized as due care claims could have meant that the claims were subject to dismissal well ahead of a trial.

18

Beyond the hurdle of establishing Individual Defendants' liability for their alleged wrongdoing, Plaintiffs faced considerable uncertainty with respect to establishing damages to TCP. Upon Plaintiffs' establishing liability, the issue of damages to TCP would have been hotly disputed and clearly would have been the subject of expert testimony proffered by all parties.[20] The damages assessments of experts retained by the parties would surely vary substantially, and the assessment of this crucial element of Plaintiffs' claims would be reduced at trial to a "battle of the experts." It is far from certain that a jury would have disregarded Individual Defendants' experts' opinions. Indeed, a jury might be swayed by defense experts seeking to establish that damages were caused by factors other than Individual Defendants' wrongdoing, or, alternatively, trying to minimize the amount of the Company's damages. *See, e.g., In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 129 (S.D.N.Y. 1997). Conceivably, a jury could find that there were no damages or that the damages were a mere fraction of the amount that Plaintiffs contended.

By contrast, the Settlement terms provide the certainty of known, material benefits to the Company. As the U.S. Court of Appeals for the Fifth Circuit cogently observed:

> Where, as here, the derivative suit is largely an attack on past corporate management practices, as well as on some present officers and directors, the dollar amount of a possible judgment, which is essentially the sole goal in the class action damage suit, is not the sole, and may well not be the most important, matter to be considered, for the effects of the suit on the functioning of the corporation may have a substantially greater economic impact on it, both long-and short-term, than the dollar amount of any likely judgment in its favor in the particular action.

---

[20] *See In re Lloyd's Am. Trust Fund Litig.*, No. 96 Civ. 1262 (RWS), 2002 U.S. Dist. LEXIS 22663, *61 (S.D.N.Y. Nov. 26, 2002) ("The determination of damages ... is a complicated and uncertain process, typically involving conflicting expert opinions. The reaction of a jury to such complex expert testimony is highly unpredictable").

*Maher,* 714 F.2d at 461.[21]    "The evaluation of such an economic impact is necessarily judgmental and imprecise and normally does not lend itself to meaningful quantification." *Id.*

Thus, while it is clear to Plaintiffs that TCP suffered *losses* as a result of the conduct challenged in the Action, the question of whether it suffered legal, non-exculpated *damages* is a much more complicated question.[22]    Thus, complex damages issues versus the known benefits of Settlement clearly weigh in favor of its approval.

###    3.    Complexity, Expense, Risk, and Duration of Further Litigation

In addition to the substantial risks associated with enforcing the Company's rights through the Courts, there were numerous risks posed by the complexity and likely expense of the further prosecution of this Action.    This Action involved complex claims concerning tens of thousands of pages of documents and, at least with respect to damages analysis, myriads of regulations and calculations.

Plaintiffs anticipated that trial of the Action would have taken, at minimum, several weeks.    The expense of such trials and the use of both judicial resources and the resources of the parties would have been substantial.    Furthermore, submitting a matter to a jury is always, at best, an uncertain proposition. *See Weiss v. Mercedes-Benz of North America, Inc,* 899 F. Supp. 1297, 1300-1301 (D.N.J. 1995). ("[W]hen parties negotiate a settlement they have far greater control of their destiny than when a matter is submitted to a jury.    Moreover, the time and expense that precedes the taking of such a risk can be staggering.    This is especially true in complex commercial litigation.").    The considerable expense of further litigation, with the

---

[21]    Indeed, in light of the highly material therapeutic benefits of the Settlement, one could argue that the governance relief obtained is and will be more valuable to the Company and its stockholders over the long-term than any comparatively modest monetary judgment Plaintiffs may have obtained at trial.

[22]    This is particularly true in light of the fact that certain Individual Defendants agreed to return or forgo valuable monetary benefits as a result of the Company's internal investigation.

20

concurrent risk of no recovery in the Action, injunctive or monetary, provides further support for the Settlement.

Additionally, in light of the nature of the Action, it is likely that any judgment in favor of Plaintiffs would have been the subject of extensive post-trial motions and appeals, further prolonging the Action, and adding a considerable risk factor. Thus, the Settlement, providing immediate benefits, was advantageous to the Company. *See, e.g., In re Warner Communications Sec. Litig.,* 618 F. Supp. 735, 748 (S.D.N.Y. 1985), *aff'd,* 798 F.2d 35 (2d Cir. 1986) ("[a]n appeal could seriously and adversely affect the scope of an ultimate recovery, if not the recovery itself.").[23]

Plaintiffs weighed each of these risks against the immediate benefits the Settlement will provide to the Company and Current TCP Stockholders. These risks presented the possibility not only that the prosecution of the Action could be unsuccessful, but that prosecution of the Action through extensive depositions and trial could be potentially detrimental to the Company. In light of the complexity, length, and uncertainty of the continued prosecution of the Action, and the benefits achieved by the Settlement, the conclusion is inescapable – the Settlement is fair and reasonable and should be finally approved.

### 4.    The Reaction of Current TCP Stockholders Also Supports a Finding That The Settlement Should Be Approved

As discussed above, pursuant to the Court's Preliminary Order, the Company filed the Notice with the SEC as an attachment to a Report on Form 8-K on June 9, 2008. *See* Johnson

---

[23]    *See Packard v. Provident Nat'l Bank*, 994 F.2d 1039 (3d Cir. 1993) (reversing judgment requiring bank to reimburse class members in excess of $60 million and dismissing case); *Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990) (class won a jury verdict and a motion for judgment N.O.V. was denied, but on appeal the judgment was reversed and the case dismissed); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979) (reversal of multimillion dollar judgment obtained after protracted trial), *cert. denied*, 444 U.S. 1093 (1980); *Trans World Airlines, Inc. v. Hughes*, 312 F. Supp. 478, 485 (S.D.N.Y. 1970), *modified*, 449 F.2d 51 (2d Cir. 1971), *rev'd*, 409 U.S. 363, 366 (1973) ($145 million judgment overturned after years of litigation and appeals).

Aff. In addition, Plaintiffs Counsel published the Summary Notice of the Settlement and the Fee Award on June 17, 2008 in *Investors' Business Daily*. *See* Hall Aff. and Weiser Compliance Aff. Here, the Notice period was 42 days, a period long enough to easily satisfy federal notions of due process.[24]

Pursuant to the Preliminary Order, any objections to the Settlement had to be lodged with the Court and served on the parties no later than July 11, 2008. Here, and despite the fact that TCP has more than 29 million shares outstanding held by thousands of stockholders,[25] Plaintiffs are not aware of a single objection to the Settlement (or for that matter, the Fee Award). "The reaction of the class to the proffered settlement is perhaps the most significant factor to be weighed in considering its adequacy." *In re SmithKline Beckman Corp. Sec. Litig.*, 751 F. Supp. 525, 530 (E.D. Pa. 1990) A small number of objections is convincing evidence of a proposed settlement's fairness and adequacy. *See, e.g., Rome v. Archer*, 197 A.2d 49, 58 (Del. 1964) (approving settlement agreement which was ratified by a very large majority of the stockholders); *Chiulli v. Hardwicke Cos., Inc.*, 1985 WL 11532 at *1 (Del. Ch) (in the absence of objection, approval of settlement "would be almost perfunctory"); *Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 118-19 (3d Cir. 1990) ("only" 29 objections out of a 281 member class "strongly favors settlement").

### 5.    Opinion of Plaintiffs' Counsel

In appraising the fairness of the Settlement, the opinion and recommendation of experienced counsel favoring the settlement is entitled to considerable weight. As one court

---

[24]  *See Miller v. Republic Nat'l Life Ins. Co.*, 559 F.2d 426, 429-30 (5th Cir. 1977) (four weeks between notice and settlement hearing was sufficient); *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 121 (8th Cir. 1975 (19 day notice period sufficient); *Greenspun v. Bogan*, 492 F.2d 375, 378 (1st Cir. 1974) (24 day notice period sufficient).

[25]  *See* the Yahoo! finance page for TCP at http://finance.yahoo.com/q/ks?s=PLCE. Notably, over 88% of the Company's float is held by institutional investors.

22

stated: "[T]he recommendations of plaintiffs' counsel should be given a presumption of reasonableness. Attorneys, having intimate familiarity with a lawsuit after litigating the action, are in the best position to evaluate the action, and the court should not without good cause substitute its judgment for theirs." *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 622 (N.D. Cal. 1979) (citations omitted); *see also In re Nat'l Student Marketing Litig.*, 68 F.R.D. 151, 155 (D.D.C. 1974) (stating that "[t]he opinion and judgment of experienced counsel, whose labors produced the settlement, should also receive due consideration."); *Schleiff v. Chesapeake & Ohio Railway Co.*, 43 F.R.D. 175, 179 (S.D.N.Y. 1967) (noting that "recommendation of the compromise by the experienced counsel for plaintiffs is entitled to great weight").

Here, Plaintiffs' Counsel have litigated scores of shareholder class and derivative actions and have well-known national reputations of pursuing their cases to a successful resolution, whether by trial or settlement. *See* Weiser Fee Aff. and Pearlman Fee Aff. Plaintiffs' Counsel have made a considered judgment based on their knowledge of the facts of the Action and their extensive experience that the Settlement is in the best interests of TCP and Current TCP Stockholders and is an excellent achievement under all the circumstances. Accordingly, the Settlement should be finally approved.

### 6.    Conclusion

In light of all of the foregoing factors, Plaintiffs' Counsel respectfully submit that the Settlement is an excellent result for TCP and Current TCP Stockholders, and that it easily exceeds the fair, reasonable and adequate standard for settlement approval. Accordingly, the Settlement should be approved.

## V.    PLAINTIFFS' COUNSELS' UNOPPOSED FEE AWARD IS FAIR AND REASONABLE AND SHOULD BE APPROVED

23

Plaintiffs' Counsel also seek approval of the Fee Award. The Fee Award is meant to reward Plaintiffs' Counsel for their efforts in prosecuting the Action on a fully contingent basis and obtaining an excellent Settlement which favorably resolves the issues involved in the Action. The Fee Award was negotiated at arm's-length only after the Settlement terms had been agreed upon. As discussed herein, the Fee Award is reasonable in light of the significant benefits achieved, the effort expended in securing the benefits set forth herein, and the entirety of the relevant circumstances. Thus, Plaintiffs' Counsel respectfully submits that the Fee Award is fair and reasonable, and warrants the Court's final approval.

### A.     Unopposed Fees in Litigation are Ideal

Pursuant to the fact that the Fee Award was negotiated at arm's-length and apart from the consideration being provided to the Company validates the fact that it is reasonable and should be approved. *See Hensley v. Eckerhart*, 461 U.S. 424 (1983) (holding that an agreed-to fee is an ideal situation because "[a] request for attorney's fees should not result in a second major litigation. Ideally, of course, litigants will settle the amount of a fee.").

Absent evidence of collusion, a negotiated fee is entitled to substantial weight and deference. *See generally, Prandini v. National Tea Co.*, 557 F.2d 1015 (3d Cir. 1977); *Court Awarded Attorney's Fees*, Report of the Third Circuit Task Force, 108 F.R.D. 237 (1985). Otherwise, Plaintiffs' Counsel would have little incentive to attempt to negotiate a fee to which Defendants would not object. There would be little reason to negotiate and compromise to bring a matter to closure if the Court were prepared, absent very strong reasons, to second-guess the parties' valuation of the services performed by Plaintiffs' Counsel.

Here, the Settling Parties' negotiations were based upon a knowledgeable analysis of what an appropriate fee would be for the benefits achieved and the fees awarded in similar

24

situations. Plaintiffs' Counsel negotiated with their adversaries, who saw their effort firsthand. Defendants' Counsel are attorneys who are employed by some of the most respected firms in the country, who have litigated complex shareholder actions for many years and know the applicable law pertaining to the Fee Award. All counsel were able to consider and utilize as precedent fee decisions from other actions of a similar nature. In such circumstances, the end result of those negotiations – which reflects all of the Settling Parties' experiences as to what is appropriate – is entitled to a great deal of weight in passing on the fee request.

For example, in *Malchman v. Davis*, 761 F.2d 893 (2d Cir. 1985), the Second Circuit concluded that courts should be hesitant to interfere in fee arrangements between settling parties in shareholder actions when defendants have agreed "not to oppose" the payment of fees up to a certain amount:

> [W]here . . . the amount of fees is important to the party paying them, as well as to the attorney recipient, it seems to the author of this opinion that an agreement "not to oppose" an application for fees up to a point is essential to completion of the settlement, because the defendants want to know their total maximum exposure and the plaintiffs do not want to be sandbagged. It is difficult to see how this could be left entirely to the court for determination after the settlement.

*Id.* at 905 n.5; *see also Court Awarded Attorney's Fees*, 108 F.R.D. at 267; *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 720 (5th Cir. 1974) ("in cases of this kind, we encourage counsel on both sides to utilize their best efforts to understandingly, sympathetically, and professionally arrive at a settlement as to attorneys' fees.").

Thus, this Court's role in approving the Fee Award is very different from a "statutory fee shifting" case, in which the defendant has not agreed to pay the plaintiff's counsel's fees and thus reserves the right to challenge every item of work performed that underlies the requested fee. Here, Defendants have agreed with Plaintiffs' Counsel on a fair and reasonable sum and

25

have agreed to pay that sum. Thus, the Court need only approve the overall settlement package – including the Fee Award – as fair, reasonable and adequate. *See, e.g., Officers for Justice*, 688 F.2d at 625.

### B.    Applicable Legal Standards

Like the standards for settlement approval, because TCP is a Delaware corporation, this Court should analyze the Fee Award under Delaware law. *See Cohn,* 375 F. Supp.2d at 854.[26] Delaware law has long recognized that the successful prosecution of shareholder derivative claims entitles plaintiff's counsel to an award of reasonable attorney's fees and reimbursement of expenses. *See Maurer v. Int'l Reinsurance Corp.*, 95 A.2d 827 (Del. 1953).[27] Additionally, a pecuniary benefit to the corporation in a shareholder derivative action is not a necessary prerequisite to an award of attorneys' fees. *See, e.g., Allied Artists Pictures Corp. v. Baron,* 413 A.2d 876, 878 (Del. 1980). The litigation does not need to act as the sole cause of the benefit for Plaintiffs' Counsel to receive a fee.[28]

---

[26] Plaintiffs' Counsel respectfully submit that federal law and Delaware law regarding awards of fees and expenses are substantially similar, and that the common concepts employed in awarding fees produces the same analysis and result. *See Pridgen v. Andresen*, C.A. No. 3:94CV851 (DFM), 2000 WL 863053, at *7, n.11 (D. Conn. Mar. 31, 2000) (inquiry under Delaware and federal law "are so similar, and the result would be the same under either"); *In re Oracle Sec. Litig.*, 852 F. Supp. 1437, 1445 (N.D. Cal. 1994) ("The court has analyzed state and federal law governing derivative counsel fees and has found no substantial differences between Delaware and federal law.").

[27] Federal law is in accord. *See Mills v. Electric Auto Lite Co.*, 396 U.S. 375, 397-97 (1970) (awarding attorneys fees based solely on therapeutic benefits to the corporation); *Unite Nat'l Retirement Fund v. Philip Watts*, 2005 WL 2877899, at *5 (D.N.J. October 28, 2005) (court awarded fee of $9.2 million for purely therapeutic relief and noted that it based the award on "the great benefit conferred upon Shell as a result of the new corporate governance principles provided for in the settlement agreement" that "will serve to prevent and protect Shell from the reoccurrence of certain alleged wrongdoing"); *In re Bristol-Myers Squibb Deriv. Litig.*, Master File No. 02-CV-8571 (LAP) (S.D.N.Y. July 22, 2005) ($3.5 million awarded for governance changes, with no direct financial benefit to the corporation).

[28] *See Steiner v. Fruehauf Corp.*, 121 F.R.D. 304, 308 (E.D. Mich. 1988), *aff'd sub nom,* (applying Delaware law, the Court concluded that "Plaintiffs litigation need only make a significant contribution to the benefit conferred");

26

In shareholder litigation, the approval of a fee agreement is a matter committed to the sound discretion of the Court. *See, e.g., Tandycrafts*, 562 A.2d at 1164-65. In exercising its discretion, under Delaware law, the Court's primary consideration is the benefit achieved through the litigation. *See, e.g., In re Prodigy Commc'n Corp. S'holders Litig.*, 2002 Del. Ch. LEXIS 95, **16-18. Other pertinent factors include the contingent nature of the fee arrangement, the amount of time, the effort expended, the complexity of the case, the quality of the work performed, and the standing and ability of the lawyers involved. *See, e.g., Sugarland*, 420 A.2d at 150; *Swacker v. Pennroad Corp.*, 57 A.2d 63, 69 (Del. 1947), *cert. denied*, 333 U.S. 862 (1948). Application of these factors strongly supports the reasonableness of the Fee Award.

### C.    The Fee Award is Fair and Reasonable in Light of the Results Obtained

Delaware courts often first look to "the nature of the benefits conferred" in evaluating a Fee Award. *See Sugarland*, 420 A.2d at 147. Here, the benefits conferred through the Settlement are significant and more than justify the agreed upon fee. *See, e.g., Tandycrafts*, 562 A.2d at 1165 (noting that it is not necessary that the benefit conferred on the shareholders be directly pecuniary for a fee award to be proper, provided, as here, there is specific benefit to the corporation/shareholders); *Allied Artists*, 413 A.2d at 890; *Chrysler*, 223 A.2d at 386. Indeed, even if the benefit is not easily quantifiable, under *Chrysler* and its progeny, the therapeutic benefits enjoyed by the Company and its shareholders as a result of the Settlement are clearly compensable.[29] In fact, Delaware courts have consistently placed a significant value upon non-monetary benefits obtained in cases similar to the Action, involving complex corporate

---

*MAXXAM*, 1987 WL 10016 at *11-12 ("The benefit need not be directly and entirely attributable to the underlying litigation.")

[29] In the oft-cited *Chrysler* decision, the court held that changes in corporate policy or a heightened level of protection for shareholders justifies an award of counsel fees. *Id.* at 386.

27

governance issues. *See e.g., Chrysler*, 223 A.2d at 389 (affirming fee award for corporate governance changes).[30]

Because the governance enhancements described above are directly related to the alleged breaches of duties and the underlying claims in the Action, Plaintiffs' Counsel respectfully submit that these enhanced protective measures will better protect the Company going forward, and they will help prevent future Company losses. *Id.*[31] Thus, the corporate reforms stemming from the Settlement are clearly compensable under Delaware law, and the size of the Fee Award that Defendants have agreed to pay is reasonable based on what has been awarded in similar actions which have produced similar relief.[32] As such, the Fee Award should be approved.

     **D.**     **The Fees and Expenses are Fair and Reasonable in Light of Other Pertinent Factors**

               **1.**     **The Time, Effort, and Expense Expended by Plaintiffs' Counsel Strongly Supports the Fees and Expenses**

---

[30] *Accord Polk*, 507 A.2d at 539 (affirming $1,700,000.00 fee award where benefit consisted of disclosure of relevant discovery materials and modification of voting provision in stock repurchase agreement); *In re Staples, Inc. S'holder Litig.*, 792 A.2d 934 (Del. Ch. 2001) ($2.75 million fees and expenses awarded for supplemental disclosures regarding stock cancellation). *See also Cohn*, 375 F. Supp.2d at 856 (applying Delaware law and awarding $2.25 million in fees even though there was no monetary benefit to the corporation).

[31] *See also Seinfeld v. Robinson*, 246 A.D.2d 291, 298 (N.Y. App. 1st Dep't 1998) (awarding fees in a shareholder derivative action which resulted in the corporation "implementing procedures that will prevent the exact sequence of events from reoccurring, [therefore] plaintiffs have furnished a benefit to all shareholders"); *Maher*, 714 F.2d at 466 (approving attorney's fees in a therapeutic derivative settlement because "influencing the future conduct may serve the interests of the corporation as fully as a recovery for past misconduct ... ").

[32] In the option backdating context*, see* Order and Final Judgment, No. 3:06-00510, *In re Family Dollar, Inc. S'holder Deriv. Litig.* (W.D.N.C. Aug. 13, 2007) (approving attorney's fee award of $3.5 million for monetary and corporate governance relief); *see also* Stipulation and Order and Final Judgment, No. 4:07-CV-00456, *Bacas v. Way*, 2008 WL 746825 (S.D. Tex. Apr. 1, 2008) (approving attorneys' fee award of $3 million where the subject corporation received no direct monetary benefits in the settlement and where company agreed, *inter alia,* to separate positions of Chair and CEO, to increase independence of its Board, and implement improved procedures in connection with its equity incentive plans designed to prevent backdating or other manipulation of stock options) ; Stipulation and Final Judgment and Order of Dismissal With Prejudice, No. 4:07-CV-00509, *Karstedt v. Isenberg* (S.D. Tex. May 14, 2008) (approving attorneys' fee award of $2.85 million where the subject corporation received no direct monetary benefits in the settlement and where company agreed, *inter alia,* to enhance Board independence and implement improved procedures designed to prevent backdating or manipulation of stock options).

In considering the time and effort expended by counsel, Delaware courts have "for good reasons having to do with efficiency and incentives, resisted the tendency to make hours expended in the effort a central inquiry, at least where a monetary benefit is achieved by the litigation." *In re Anderson Clayton S'holders Litig.*, 1988 WL 97480, *2 (Del. Ch. Sept. 19, 1988) (citations omitted).   Rather, the Court looks favorably upon counsel that are able to achieve substantial benefits without unduly burdening the parties and the Court with time-consuming and costly motion practice, discovery disputes, trials, and appeals. *See, e.g., Seinfeld v. Coker*, 847 A.2d 330, 333 (Del. Ch. 2000) (citations omitted) ("One of the historic reasons Delaware judges have been so willing to award substantial attorneys' fees, even after a relatively quick settlement of the case, is that our fee awards are not structured to reward lawyers for needlessly prolonging litigation. Put simply, the Court does not want to be in a position of encouraging the churning of wheels and devoting unnecessary hours to litigation in order to be able to present larger numbers to the Court.'").  Moreover, as discussed more fully below, courts recognize that counsel who represent shareholders on a contingent basis are entitled to a premium for the risk they take in prosecuting the litigation with no assurance of receiving compensation for their efforts. *Id.* at 334.[33]

Notwithstanding the Delaware view, Plaintiffs' Counsel are aware that federal courts tend to review lodestar[34] when reviewing fee applications in shareholder class actions.  Initially, the

---

[33] As stated by the Second Circuit in its seminal *Grinnell* opinion, the "contingent risk of litigation" is an important factor to be considered in making an appropriate fee award. Thus, in *Grinnell*, the Second Circuit explained:

> No one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success. Nor, particularly in complicated cases producing large recoveries, is it just to make a fee depend solely on the reasonable amount of time expended.

[34] As this Court is well-aware, the lodestar/multiplier approach entails two steps. *See e.g., Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 46 (2d Cir. 2000).   First, to determine the applicable lodestar, the court multiplies the

lodestar is calculated by multiplying the number of hours expended by the hourly rate. Courts then multiply the lodestar amount by a risk premium factor (or "multiplier") based on the risk of recovery and other considerations, to arrive at a reasonable fee. *See, e.g., Blum v. Stenson*, 465 U.S. 886 (1984). The contingency factor is based on elementary considerations of fairness and justice. As the United States Court of Appeals for the Fourth Circuit explained in *McKittrick v. Gardner*, 378 F.2d 872, 875 (4th Cir. 1967), "[t]he effective lawyer will not win all of his cases, and any determination of the reasonableness of his fees in those cases in which his client prevails must take account of the lawyer's risk of receiving nothing for his services."

Plaintiffs' Counsel collectively have expended approximately 387.7 hours in the prosecution and settlement of the Action for a cumulative lodestar of $186,268.75, exclusive of expenses. *See* Weiser Fee Aff. and Pearlman Fee Aff.[35] Thus, if the Court were to approve the full Fee Award, Plaintiffs' Counsel would receive a multiplier of approximately 3.7 on their time, a demonstrably reasonable multiplier based on relevant precedent for the contingent risk they undertook to represent the interests of the Company and its shareholders. *See, e.g., Weiss v. Mercedes-Benz of N. Am. Inc*, 899 F. Supp. 1297 (D.N.J. 1995), *aff'd*, 66 F.3d 314. (holding that a multiplier of 9.3 was acceptable).[36] Thus, the lodestar approach clearly demonstrates that the

---

number of hours expended by plaintiffs' counsel in litigating the case by their reasonable hourly rates. *Id*. Second, the court adjusts that figure (usually by applying a "multiplier") to reflect such factors as: (1) the risk involved and the contingent nature of the litigation; (2) the quality of the work performed and time and labor expended by counsel; (3) the result achieved; and (4) the complexity and magnitude of the litigation. *Id*.

[35]  Plaintiffs' Counsel have also incurred unreimbursed expenses in the amount of $9,461.28 *See* Weiser Fee Aff. and Pearlman Fee Aff.

[36]  This District's multiplier case law is in accord with case law from other federal districts, and Plaintiffs' Counsel respectfully submit that the lodestar multiplier here would be considered reasonable for this type of action in virtually any jurisdiction in this country. *See, e.g., In re Beverly Hills Fire Litig.*, 639 F. Supp. 915 (E.D. Ky. 1986) (multiplier of 5); *In re Boston and Maine Corp. v. Sheehan, Phinney, Bass & Green, P.A.*, 778 F.2d 890 (1st Cir. 1985) (multiplier of 6); *Conley v. Sears, Roebuck and Co.*, 222 Bankr. 181, 1998 U.S. Dist. LEXIS 7503 (D. Mass. 1998) (multiplier of 8.9 in a derivative action); *Behrens v. Wometco Enterprises, Inc.*, 118 F.R.D. 534, 549 (S.D. Fla. 1988) ("Most lodestar multiples awarded in cases like this are between 3 and 4"), *aff'd*, 899 F.2d 21 (11th Cir.

Fee Award is reasonable based on the efforts of Plaintiffs' Counsel. Thus, the Fee Award should be approved.

### 2.   The Contingent Nature of Plaintiffs' Counsel's Undertaking Justifies the Fee Award

Delaware courts, among many others, have long-recognized that in reviewing fee agreements, the fact that petitioner's compensation is contingent upon recovery should be taken into account. The contingency factor is based on elementary considerations of fairness and justice. As the Fourth Circuit explained in *McKittrick*, 378 F.2d at 875 "The effective lawyer will not win all of his cases, and any determination of the reasonableness of his fees in those cases in which his client prevails must take account of the lawyer's risk of receiving nothing for his services." *See also Chrysler*, 223 A.2d at 389. (Chancellor exercised "sound business judgment" by taking "the contingent nature of the litigation" into consideration in fixing the amount of attorneys' fees.)

The contingent nature of Plaintiffs' Counsels' engagement in the Action and the risks of litigation should be given substantial weight by the Court in reviewing the Fee Award. When Plaintiffs' Counsel undertook the representation of the Plaintiffs in the Action, they were aware that they would devote hours of hard work to the prosecution of a difficult case, possibly on an expedited basis, without any assurance of receiving any fees or even reimbursement for out-of-pocket expenses.

---

1990); *In re Ikon Office Solutions, Inc.*, 194 F.R.D. 166 (E.D. Pa. 2000) (approving multiplier of 3.7 in a derivative action).

31

Moreover, the risk of non-payment in contingent-fee stockholder litigation is quite real. For example, in the well-known *Disney* derivative action, plaintiffs' counsel devoted thousands of hours, and incurred millions of dollars in expenses, only to see judgment entered against them on all claims, which was affirmed on appeal. *Disney*, 907 A.2d at 693, *aff'd*, 906 A.2d at 27.[37] Indeed, the reported and unreported opinions of the Delaware Chancery Court and Supreme Court are replete with examples of other stockholder actions that were dismissed outright on motion practice,[38] or ultimately ended in post-trial defeat.[39]   No fee of any sort is earned or awarded in such cases, nor do Plaintiffs' counsel recover their often substantial out-of-pocket expenses.

Thus, while Plaintiffs' Counsel succeeded in obtaining an excellent result for the Company and its shareholders, it cannot be disputed that they incurred substantial risk that the Action would be unsuccessful and that their efforts would go entirely uncompensated. The Fee Award appropriately reflects the risk that Plaintiffs' Counsel would expend substantial time, effort, and costs only to have the Action dismissed. Thus, the Fee Award should be approved based on the contingent nature of Plaintiffs' Counsels' undertaking.

### 3.   Standing and Ability of Plaintiffs' Counsel

---

[37] "The Court is well aware that there are numerous contingent cases such as this where plaintiff's counsel, after investing thousands of hours of time and effort, have received no compensation whatsoever. Numerous cases recognize that the attorney's contingent fee risk is an important factor in determining the fee award. In evaluating [the contingent fee] factor the Court will not ignore the pecuniary loss suffered by plaintiff's counsel in other actions where counsel received little or no fee." *Ressler v. Jacobson*, 149 F.R.D. 651, 656-57 (M.D. Fla. 1992) (citations omitted).

[38] There are so many Delaware decisions (many of which were affirmed on appeal) dismissing stockholder suits based on Rule 23.1 (demand futility) and Rule 12(b)(6) (failure to state a claim) that any effort to provide an illustrative list would seem trivial. It should suffice to say that far more stockholder actions end in defeat than victory.

[39] See, e.g., *Emerald Partners v. Berlin*, 787 A.2d 85 (Del. 2001) (entering judgment for defendants on all claims after two trials); *Kahn v. Lynch Commc'n. Sys., Inc.*, 669 A.2d 79 (Del. 1995) (dismissal of all plaintiffs derivative claims on appeal).

32

Another factor that the Court may consider on an application for counsel fees is the standing and ability of counsel. The attorneys who prosecuted the Action on behalf of Plaintiffs are nationally recognized practitioners in the field of shareholder derivative litigation. *See* Weiser Fee Aff. and Pearlman Fee Aff. The standing of opposing counsel may also be considered in determining an allowance of counsel fees. *See, e.g., Warner*, 618 F. Supp. at 749. Defendants here were represented by experienced, skillful and well-respected attorneys that vigorously defended their clients' interests. Clearly, they were motivated to negotiate an attorney fee provision that was fair and in the best interests of their clients. Under these circumstances, the fact that they have agreed "not to oppose" the Fee Award is a testament to its fairness and it should be approved by the Court.

### 4. The Fact that No Current TCP Stockholder Has Objected to the Fees and Expenses Also Supports their Fairness

Plaintiffs' Counsel also notes that no Current TCP Stockholder has objected to the Fee Award, even though the Fee Award was disclosed in the Notices. Although not a factor that Delaware courts typically employ in analyzing a fee agreement, other courts[40] have found this inquiry instructive (if not dispositive), and Plaintiffs' Counsel believes that the Court should consider this factor in approving the Fee Award.

### 5. Public Policy

Individuals wronged by violations of corporate law should have reasonable access to counsel with the ability and experience necessary to analyze and litigate complex cases. The costs and fees involved in such litigation often substantially outweigh the economic interest the individual stockholder has at stake. Moreover, such individuals rarely have the financial

---

[40] *See, e.g., Weiner v. Roth*, 791 F.2d 661, 663 (8th Cir. 1986); *In re New Mexico Natural Gas Antitrust Litig.*, 607 F. Supp. 1491, 1507 (D. Colo. 1984); *Ochs v. Ruttenberg*, 446 F. Supp. 145, 149 (S.D.N.Y. 1978).

resources to pay customary fixed hourly rates for such services. The complexity and the societal importance of shareholder litigation requires the involvement of the most able counsel obtainable. To encourage first-rate attorneys to represent plaintiffs on a contingent basis in this type of socially important litigation, attorneys' fees awarded should reflect this goal. *See, generally, Allied Artists*, 413 A.2d at 878. The outstanding results achieved in the Action is a prime example of the value created by the skilled and experienced Plaintiffs' Counsel, and their efforts and results deserve to be rewarded.

In summary, for all of the foregoing reasons, the Fee Award should be approved.

## VII.    THE INCENTIVE AWARDS FOR THE PLAINTIFFS SHOULD BE APPROVED

Finally, the Stipulation provides for incentive awards for Nuttall and Lindeman in the amount of $2,500.00 each.[41]  Plaintiffs' Counsel believes that these nominal awards should be approved in light of the significant benefits these two TCP stockholders have created for all Current TCP Stockholders.

There is a long history of Federal and Delaware common law that authorizes incentive awards for representative plaintiffs in stockholder actions. *See, e.g, Denney v. Jenkens & Gilchrist*, 2005 WL 388562, at *31 (S.D.N.Y. Feb. 18, 2005) (based on the common law's recognition of the important policy role that plaintiffs play in representative actions); *In re Dun & Bradstreet Credit Servs. Customer Litig.*, 130 F.R.D. 366, 374 (S.D. Ohio 1990) (awarding two class representatives $55,000 each and three class representatives $35,000 each). This principle was reaffirmed by the U.S. District Court for the District of Minnesota: "[s]uch enforcement is vital because if there were no individual shareholders willing to step forward and

---

[41]  Any Plaintiff incentive award approved by the Court would be paid from the Fee Award, to the extent that the Court approves that agreement.

pursue a claim on behalf of other investors, many violations of law might go unprosecuted." *In re Xcel Energy, Inc.*, 364 F. Supp.2d 980, 1000 (D. Minn. 2005).

The proposed incentive awards in the Action are clearly modest when compared with other awards approved by federal courts in the 3rd Circuit.[42]   *See, e.g., In re Remeron End-Payor*, 2005 WL 2230314, *32 (D.N.J. 2005) (approving awards of $30,000 to both of the named plaintiffs); *In re SmithKline Beecham Corp.*, 751 F. Supp. 525, 535 (E.D. Pa. 1990) (approving $5,000 award to each of the representative plaintiffs); *In re Cendant Corp. Deriv. Litig.*, 232 F. Supp.2d 327 (D.N.J. 2002) (approving award of $25,000 to the lead plaintiff).   For all of the foregoing reasons, the incentive awards for Nuttall and Lindeman should be approved.[43]

---

[42] The proposed incentive awards are also modest when compared to incentive awards approved by Delaware courts. *See, e.g., Raider v. Sunderland,* 2006 WL 75310, *1 (Del. Ch. Jan. 5, 2006) (stating that incentive awards are justified both in Delaware and in federal courts, awarding plaintiff an incentive award in the amount of $42,400, and noting that Delaware courts have previously approved individual incentive awards as high as $65,000 and $95,000).

[43] The Incentive Awards were disclosed in the Notices, and no Current TCP Stockholder has objected to them.

35

VI.    CONCLUSION

The Settlement clearly represents a fair, adequate, and reasonable result in light of the nature and strength of Plaintiffs' claims, the defenses thereto, the procedural posture of the Action, and all other pertinent facts and circumstances. Moreover, the unopposed Fee Award is entirely fair and reasonable in light of the substantial benefits achieved in the Action. Accordingly, for all of the foregoing reasons, Plaintiffs respectfully request that the Court approve the Settlement, the Fee Award, and the Incentive Awards.

Respectfully submitted,

DATED: July 14, 2008

COHN LIFLAND PEARLMAN
  HERRMANN & KNOPF LLP
PETER S. PEARLMAN
JEFFREY W. HERRMANN

_____
PETER S. PEARLMAN

Park 80 Plaza West-One
Saddle Brook, NJ  07663
Telephone:  201/845-9600
201/845-9423 (fax)

THE WEISER LAW FIRM, P.C.
ROBERT B. WEISER
BRETT D. STECKER
JEFFREY J. CIARLANTO
121 N. Wayne Avenue, Suite 100
Wayne, PA 19087
Telephone:  610/225-2677
610/225-2678 (fax)

Attorneys for Plaintiff

36